# THE PUBLIC SERVICE COMMISSION OF MARYLAND

*vs.*

## THE NORTHERN CENTRAL RAILWAY COMPANY ET AL.


## THE NORTHERN CENTRAL RAILWAY COMPANY ET ALS.

*vs.*

# THE PUBLIC SERVICE COMMISSION OF MARYLAND.

*Common carriers*: *regulation of*—; *by Legislature or duly constituted Commission.   Railroads: switching rights; interchange and transportation of carload freight; use of terminals; just compensation; rates; Public Service Commission; evidence; computations from books of carriers; rate fixing a legislative function; appeals; jurisdiction of courts.   Due process of law. Law of land.*

To give the use of their tracks and terminals to competing lines is not a common law obligation of carriers.        p. 372

The Legislature may, subject to constitutional limitations, prescribe reasonable regulations for the conduct of common carriers, and impose upon railroad companies operating within the State, duties exceeding their common law obligations, and may exercise this right not only directly, but also through a commission duly constituted for that purpose.        p. 372

In general, a railroad company can not (without adequate compensation) be required to deliver to another railroad company, at a junction at or near its terminals, carload freight for delivery at the terminals of a competing line, when the terminals of the latter are at or near the terminals of the former;

nor can a railroad company be required to receive such freight
from a connecting line at a point of connection at or near its
terminal, for delivery to its terminals.                    p. 379

Under the Public Service Commission Act, a common car-
rier may be required to receive from another railroad carload
freight, and haul the same to its terminal, provided the point
of connection is not at or near its terminal.               p. 379

"The law of the land," as used in the State Constitution, and
"due process of law," as used in the Fourteenth Amendment to
the Constitution of the United States, have the same signifi-
cance.                                                      p. 386

An order of the Public Service Commission requiring the
Baltimore & Ohio R. R. Company to accept the carload freight
delivered to it by the Pennsylvania R. R. Co., at a connecting
point near Baltimore City, and to haul the same to the termi-
nal of the Baltimore & Ohio R. R. Co., must be regarded as
an order for "transportation," and if just compensation be pro-
vided and required therefor, it is not to be considered as a tak-
ing of property without "due process of law," nor as a viola-
tion of the charter of the Baltimore & Ohio R. R. Company
(Chapter 123 of the Acts of 1826), which declares that "it
shall not be lawful for any other company or person, etc., to
travel upon or use the roads of the company, etc., without the
license or permission of the President or Directors of said
company."                                              pp. 386, 387

Courts in considering the reasonableness of rates fixed by
the Public Service Commission should have before them the
evidence that was produced before the Commission at the hear-
ing.                                                        p. 388

The power of the Commission to fix the reasonableness of
rates, etc., is *legislative*, and the functions of the Court in re-
viewing such actions of the Commission are *judicial*, and are
only exercised for the purpose of determining whether such
action of the Commission is unreasonable or unlawful.    p. 388

Upon the petition for an injunction to restrain an order of
the Public Service Commission fixing rates, the Court has no
authority to determine what would be a reasonable rate, or to

establish any rate; its power is limited to the determination of the question whether the rates fixed by the Commission are unreasonable or unlawful, and until it is made to appear by clear and satisfactory evidence that such rates are unreasonable and unlawful, courts are without power to restrain the Commission's order.                    p. 389

While evidence as to rates, etc., of other cities, may not show that conditions there are in all respects the same as at the city and neighborhood for which the Public Service Commission may be seeking to establish rates, yet such evidence is admissible in considering the unreasonableness of the rates fixed upon.
                    p. 389

While the evidence introduced by a railroad before a Public Service Commission from the corporation's own books, to show the cost of its services, may not be strictly and absolutely accurate, yet such evidence is admissible.                    p. 390

Common carriers may not be required to perform services at rates less than the actual cost of such services.                    p. 390

While the movement by a railroad of carload freight, delivered to it by another at a point of junction, may be ordered by the Public Service Commission as being "transportation," yet the rates for such transportation will not be considered reasonable or lawful, unless they include a charge, for the necessary use of the terminals, which is reasonable to such service.
                    pp. 391-392

*Decided January 15th, 1914.*


Cross-appeals from Circuit Court No. 2 of Baltimore City. (DUFFY, J.)


The causes were argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Shirley Carter,* for the Northern Central Railway Co.

*W. Cabell Bruce,* for the Public Service Commission.

THOMAS, J., delivered the opinion of the Court.

These appeals are from a decree of the Circuit Court No. 2 of Baltimore City, dissolving in part a preliminary injunction theretofore granted against the Public Service Commission of Maryland, and making said injunction perpetual as to other features of the order of said Commission.

On the 11th of January, 1911, the Baltimore Drug Exchange and certain other trade associations filed their petition or complaint with the Public Service Commission of Maryland against the Baltimore Belt Railroad Company, the Baltimore and Ohio Railroad Company, the Northern Central Railway Company, the Pennsylvania Railroad Company, the Philadelphia, Baltimore and Washington Railroad Company, the Western Maryland Railway Company, and the Union Railroad Company, in which, after alleging that the petitioners were organized for the purpose of promoting the business of their members, and that their principal offices were in Baltimore City, they charged that the defendants were common carriers engaged in the transportation of passengers and property between points in the State of Maryland, and as such were subject to the provisions of the Act of 1910, creating the Public Service Commission of Maryland; that the defendants charged for local switching movements of carloads of freight between points on their lines in Baltimore City, or Baltimore County adjacent thereto, certain class rates; that the class rates of the Baltimore and Ohio Railroad Company were six cents per one hundred pounds for the first, second and third classes of freight, and five cents per one hundred pounds for the fourth, fifth and sixth classes; that the class rates charged by the Northern Central Railway Company, the Philadelphia, Baltimore and Washington Railroad Company and the Union Railroad Company were six cents per one hundred pounds for first-class freight, five cents per one hundred pounds for the second and third classes of freight, and four cents per one hundred pounds for the fourth, fifth and sixth classes; that for a movement of a carload of freight from a station on one of

the defendants' lines to a station on the line of one of the other defendants within Baltimore City, or Baltimore County adjacent thereto, the charges were based on the sum of the two class rates, and that therefore if a shipper desired a car of first-class freight moved from Camden Station, on the Baltimore and Ohio Railroad, to Bolton Station, on the Northern Central Railway, he would have to pay to the Baltimore and Ohio Railroad Company six cents per hundred pounds to move the car from Camden Station to Bay View, where the Baltimore and Ohio Railroad connects with the Northern Central Railway, and would have to pay to the Northern Central Railway Company six cents per hundred pounds to move said car from Bay Veiw to Bolton Station; that the Baltimore and Ohio Railroad Company and the Northern Central Railway Company, the Philadelphia, Baltimore and Washington Railroad Company, and the Union Railroad Company had by agreement established a joint rate, effective December 15th, 1910, whereby a shipper could have a car loaded with freight moved from a station on one of said railroads to a station on another of said railroads, within Baltimore City, or Baltimore County adjacent thereto, at the following rates: First-class freight for eleven cents, second-class for ten cents, third-class for eight cents, fourth-class for seven cents, fifth-class for six cents, and sixth-class for five cents per hundred pounds; that said rates subjected the members of the associations to the payment of sums ranging from six dollars to fifty dollars per car for such switching movements; that said rates were unjust, unreasonable and discriminatory and in violation of said Act of 1910, "and that other cities, active competitors of Baltimore, enjoy switching charges averaging substantially three dollars per car." The petition further alleged that said excessive charges were due in part to a failure of the defendants to construct and maintain switch connections within the city at points where the same could be properly made, and then prayed the Commission to pass an order requiring the defendants to define the Baltimore City switching limits; to construct and

maintain additional switch connections for the exchange of freight, an interchange car-float service between Canton and Locust·Point, and establish "flat switching charges for local or joint switch movements, not exceeding the following: five miles and under, three dollars and fifty cents per car; ten miles and over five, four dollars per car; fifteen miles and over ten, five dollars per car; over fifteen miles, six dollars per car."

The answer of the Northern Central Railway Company, the Philadelphia, Baltimore and Washington Railroad Company, the Pennsylvania Railroad Company and the Union Railroad Company of Baltimore denied·that the Pennsylvania Railroad Company was engaged in the transportation of property and passengers between points in the State of Maryland, and that the Union Railroad Company was engaged in such transportation except in so far as other railroad companies use its road and facilities for that purpose. It admits that the Northern Central Railway Company and the Philadelphia, Baltimore and Washington Railroad Company charged and collected the rates referred to in the petition of the complainants, but denies that said rates were unreasonable, unjust or unduly discriminatory, and that other cities, active competitors of Baltimore, enjoy switching charges of three dollars per car. It denies the further allegations of the petition, and that said rates were in violation of the Public Service Commission Act of 1910.

The answer of the Baltimore and Ohio Railroad Company and the Baltimore Belt Railroad Company was practically to the same effect, except that they denied that the rates for the transportation of a carload of freight between points on their lines within the City of Baltimore, or Baltimore County adjacent thereto, and points on the lines of the other defendants within the City of Baltimore, or Baltimore County adjacent thereto, were based on the sum of the local rates of said defendants and the other defendants, and that the rates from Camden Station to Bolton Station, on different classes of

freight, were twelve, eleven, eleven, nine, nine and nine cents per hundred pounds, as stated in the complainants' petition.

After a hearing the Public Service Commission of Maryland passed, on the 31st day of May, 1912, the following order:

"Ordered, 1. That the defendants, the Baltimore Belt Railroad Company, the Baltimore and Ohio Railroad Company, the Northern Central Railway Company, the Philadelphia, Baltimore and Washington Railroad Company, the Western Maryland Railway Company, and the Union Railroad Company, be and they severally are hereby notified and required to cease and desist, on or before the 1st day of August, 1912, from charging, exacting, demanding and receiving the rates and charges heretofore charged, exacted, demanded and received for the transportation of intrastate commerce of carloads of property from and to their and each of their several spurs, tracks, junctions, yards and terminals situate and located within the boundaries in the second paragraph of this order designated and described.

"2. It is further ordered, that the said defendants be, and they severally are, hereby notified and required to establish and put in force on or before the 1st day of August, 1912, and maintain during the period of five years thereafter and until changed by further order of the Commission a 'Switching District' for the City of Baltimore, to include all the territory within the following boundary lines, to wit:

"From a line drawn from Notre Dame, a station on the Maryland and Pennsylvania Railroad, to and including Rosedale, a station on the Baltimore and Ohio Railroad; thence southeasterly to and through Back River, a station on the Philadelphia, Baltimore and Washington Railroad; thence south to and through Turner, a station on the Baltimore and Sparrow's Point Branch of the Northern Central Railway; thence southwesterly to Curtis Bay, a station on the Baltimore and Ohio Railroad (including Wagner's

Point); thence west to and through Monumental, a station on the Baltimore and Ohio Railroad; thence northwesterly to and including Primrose, a station on the Catonsville Branch of the Philadelphia, Baltimore and Washington Railroad; thence north to and including Arlington, a station on the Western Maryland Railway; thence northeasterly through and including Melvale, a station on the Northern Central Railway, to Notre Dame, the place of beginning.

"3. It is further ordered, that said defendants be, and they severally are, hereby notified and required to establish and put in force on or before the 1st day of August, 1912, and apply thereafter during the period of not less than three years and until the further order of the Commission, to the transportation of intrastate commerce of property in carloads from and to the spurs, tracks, junctions, yards and terminals of said defendants within the territory in this order above mentioned and described the rates and charges, as follows, to wit:

A rate and charge not in excess of one dollar per car for all services in connection with yard switching as in this order hereafter defined; rates and charges for all services in connection with Connecting Line Switching, not in excess of three dollars per car when in connection with a line movement, and not in excess of six dollars when in connection with a Local Movement, both movements as in this order hereafter defined; rates and charges for all services in connection with Intermediate Switching, not in excess of four dollars when in connection with a line movement and not in excess of seven dollars and fifty cents when in connection with a local movement, both movements as in this order hereafter defined; and a rate and charge not in excess of five dollars per car for all services in connection with Industrial Switching, as in this order hereafter defined.

"4. It is further ordered, that for the purposes of this order:

"*Yard Switching* is hereby defined to be and shall be the movement of a loaded car from any spur, siding or track in a yard of any carrier to another spur, siding or track in the same yard.

"*Connecting Line Switching* is hereby defined to be and shall be the movement of a loaded car from any spur, track, junction, yard or terminal of one carrier to any spur, track, junction, yard or terminal of another carrier, provided, that said movement shall not require the use of the instrumentalities and facilities of more than two carriers.

"*Line Movement Connecting Line Switching* is hereby defined to be and shall be when a car has received or will receive further transportation beyond the Baltimore Switching District as hereinbefore described and defined.

"*Local Movement Connecting Line Switching* is hereby defined to be and shall be the movement of a car locally between points within the Baltimore Switching District as hereinbefore described and defined.

"*Intermediate Switching* is hereby defined to be and shall be the movement of a loaded car from any spur, track, junction, yard or terminal of one carrier, thence to and over the lines of another carrier, and thence to a spur, track, junction, yard or terminal of a third carrier.

"*Line Movement Intermediate Switching* is hereby defined to be and shall be when a car has received or will receive further transportation beyond the Baltimore Switching District as hereinbefore described and defined.

"*Local Movement Intermediate Switching* is hereby defined to be and shall be the movement of a car locally between points within the Baltimore Switching District as hereinbefore described and defined.

"*Industrial Switching* is hereby defined to be and shall be the movement of a loaded car from any spur, track, junction, yard or terminal of a carrier to any spur, track, junction, yard or terminal of the same carrier.

"5. It is further ordered, that for the purposes hereof, the interpretation and construction of the word 'carrier' as in the preceding paragraph mentioned shall be taken and applied to the Baltimore Belt Railroad and the Baltimore and Ohio Railroad as constituting one carrier, and the Philadelphia, Baltimore and Washington Railroad, the Union Railroad and the Northern Central Railway as constituting one carrier.

"6. It is further ordered, that this order shall not be construed to change or affect the existing rates or charges now applying to shipments of intrastate freight via the Western Maryland Railway or delivery of such freight at or to the spurs, tracks, junctions, yards or terminals of the Union Railroad.

"7. It is further ordered, that the several defendants be and they hereby are required to perform at all times the services in this order mentioned and described with adequate facilities and by and over the most expeditious available routes."

On the 27th day of July, 1912, the Northern Central Railway Company, the Philadelphia, Baltimore and Washington Railroad Company and the Union Railroad Company of Baltimore filed a bill of complaint in the Circuit Court No. 2 of Baltimore City against the Public Service Commission of Maryland praying that the order passed by said Commission be declared unreasonable, unlawful and null and void, and be vacated and set aside, and that said Commission be enjoined from enforcing or putting said order into effect, and on the same day a similar bill was filed in said Court by the Baltimore and Ohio Railroad Company and the Baltimore Belt Railroad Company.

The Court below held that the order of the Public Service Commission was unlawful and unconstitutional in so far as it required the railroad companies mentioned to perform the services designated and defined in said order as "Connecting Line Switching" and "Intermediate Switching;" that, so far as the Court was then advised, said order was lawful and

valid to the extent that it required the said railroad companies to perform, at the rates therein fixed, the services designated and defined therein as "Yard Switching" and "Industrial Switching," and, accordingly, on the 23rd day of April, 1913, passed a decree dissolving the preliminary injunction as to that part of the order of the Public Service Commission of Maryland that required the railroad companies to perform the services designated and defined in said order as "Yard Switching" and "Industrial Switching" without prejudice to said railroad companies, and making perpetual the injunction as to that part of the order of the Public Service Commission of Maryland requiring the several railroad companies to perform the services designated "Connecting Line Switching" and "Intermediate Switching."

The appeals in this case are by the Public Service Commission of Maryland from that part of the decree enjoining the enforcement of its order in reference to "Connecting Line Switching" and "Intermediate Switching," and by the Northern Central Railway Company, the Philadelphia, Baltimore and Washington Railroad Company and the Union Railroad Company from that part of the decree dissolving the preliminary injunction in so far as it refers to the enforcement of the Commission's order in regard to "Yard Switching" and "Industrial Switching."

It appears from the evidence that the spurs, tracks, junctions, yards and terminals referred to in the order of the Public Service Commission of Maryland constitute what the companies describe as the terminals and terminal facilities of the several railroad companies referred to in said order within Baltimore City, and Baltimore County adjacent thereto. The Union Railroad is a toll road, and all the terminals, tracks, spurs, yards and stations connected with its main tracks are owned and controlled by the Northern Central Railway Company and the Philadelphia, Baltimore and Washington Railroad Company. These three companies will be referred to hereafter as the Pennsylvania Railroad Company. The Baltimore Belt Railroad extends from Hamburg

Street, in Baltimore City, to Bay View, in Baltimore County, and is leased and operated by the Baltimore and Ohio Railroad Company. The Pennsylvania Railroad Company and the Baltimore and Ohio Railroad Company own very extensive terminals and terminal facilities within the district referred to in the order of the Public Service Commission of Maryland. These terminals and terminal facilities consist of freight yards, depots, warehouses, elevators, piers, stockyards, industrial sidings, etc., and were constructed and are maintained by said companies at great cost and expense to them. The terminals of the Western Maryland Railway Company are very much less extensive. The only connection of the Baltimore and Ohio Railroad with the Pennsylvania Railroad is by the Baltimore Belt Railroad from Camden Station to Bay View Junction. which is about seven miles from Camden Station, where the Baltimore Belt Railroad connects with the Northern Central Railway. The Baltimore and Ohio Railroad does not connect with the Western Maryland Railway, but the latter road connects with the Philadelphia, Baltimore and Washington Railroad at Fulton Junction. Prior to 1910 the Pennsylvania Railroad Company, the Baltimore and Ohio Railroad Company and the Western Maryland Railway Company charged local class rates for the movement of freight from the terminals of one of said railroads to its connection with another within the limits referred to in the order of the Public Service Commission. The class rates of the Pennsylvania Railroad Company were six cents per hundred pounds for first class freight, five cents for second and third classes, and four cents for fourth, fifth and sixth classes of freight. The class rates of the Baltimore and Ohio Railroad Company were six cents per hundred pounds for the first, second and third classes of freight, and five cents for fourth, fifth and sixth classes. The class rates of the Western Maryland Railway Company. to junctions not more than five miles distant, were six cents per hundred pounds for first and second classes of freight; five cents for third and fourth. and four cents for fifth and sixth classes.

The fourth, fifth and sixth classes are the classes of freight usually shipped in carload lots, and the charge at these local class rates for moving a car of fifth class freight, weighing twenty tons, from a terminal of the Baltimore and Ohio Railroad to the point of its connection with the Pennsylvania Railroad, and from that point to a terminal of the latter road, was thirty-six dollars, the sum of the local rates.

In 1910 the Baltimore and Ohio Railroad Company and the Pennsylvania Railroad Company established, effective December 15th, 1910, for such movements of freight the following joint class rates; for first class freight, eleven cents per hundred pounds; for second class, ten cents; for third class, eight cents; for fourth class, seven cents; for fifth class, six cents, and for sixth class, five cents. The charge for the same movement of freight referred to above at these joint class rates is twenty-four dollars.

The Pennsylvania Railroad Company and the Baltimore and Ohio Railroad Company also established joint class rates from points outside of the City of Baltimore, which were made by adding to the local rates to Baltimore the following differentials; five cents per hundred pounds for first and second classes of freight, and two cents for third, fourth, fifth and sixth classes. Applying these joint class rates to a car of fifth class freight, weighing twenty tons, shipped over the Baltimore and Ohio Railroad and consigned to a Pennsylvania Railroad terminal, the cost to the shipper of the delivery to the Pennsylvania Railroad terminal was eight dollars. In addition to the joint class rates to which we have referred, there were in force at the date of the order of the Public Service Commission of Maryland what are called joint commodity rates. These commodity rates applied to special shipments, and in making them the two cents per hundred pounds, or forty cents per ton, fifth class differential was taken as a basis, and graduated as follows: Where the line-haul rate was two dollars or more per ton, the differential would be forty cents; where the line-haul rate was one dollar and under two dollars, the differential was thirty cents, and

where the line-haul rate was under one dollar, the differential was twenty cents. These commodity rates applied to a car of freight weighing twenty tons shipped over the Pennsylvania Railroad for delivery at a terminal of the Baltimore and Ohio Railroad Company would result in charges for delivery at the terminal of the Baltimore and Ohio Railroad Company of eight dollars, six dollars and four dollars, according to the line-haul rate. In other words, if the line-haul rate of the Pennsylvania Railroad Company was less than one dollar per ton, and the car weighing twenty tons was consigned to a terminal of the Baltimore and Ohio Railroad Company, the cost to the shipper of delivery to the terminal of the Baltimore and Ohio Railroad Company would be four dollars.

The several amounts we have named as the cost to the shipper under the joint rate agreements, of delivery at the terminal of a railroad other than the railroad on which the freight originated, are not, however, the amounts that the railroad at whose terminal the freight is delivered receives for its services and the use of its terminals. The joint rate agreements provide for a division of the rates. Under these agreements the distance between the point at which the freight originates and the point of delivery is divided into blocks. The railroad company at whose terminal the freight is delivered receives one and one-half cents per hundred pounds for the use of its terminal, and its proportion of the balance according to the number of blocks, the freight is hauled over its road—a fraction of a block being counted as a block. This arrangement for a division of the rate applied to a shipment over the Pennsylvania Railroad from Buffalo, New York, to Camden Station, on the Baltimore and Ohio Railroad, at a joint rate of fifteen cents per hundred pounds, which would amount to ninety dollars for a car weighing thirty tons, is explained by one of the witnesses as follows: The car would be delivered to the Baltimore and Ohio Railroad Company at Bay View, within the switching district referred to, and would be transferred from there to Camden

Station by the Baltimore and Ohio Railroad Company; the Baltimore and Ohio Railroad Company would receive one and one-half cents per hundred pounds for the use of its terminal and twenty per cent. of the balance, making in all twenty-five dollars and twenty cents. Under the order of the Public Service Commission the Baltimore and Ohio Railroad Company would receive for the use of its terminal and for the same service only three dollars, and the Pennsylvania Railroad Company would receive its rate from Buffalo to Baltimore, or its rate less the three dollars, if it absorbed the switching charge. The evidence in the case furnishes another illustration of a division of a joint rate. The Baltimore and Ohio Railroad Company's rate on brick from Frederick, Maryland, to Baltimore City is sixty-five cents per ton. The joint rate of the Baltimore and Ohio Railroad Company and the Pennsylvania Railroad Company for bricks shipped from Frederick over the Baltimore and Ohio Railroad for delivery at a terminal of the Pennsylvania Railroad Company is eighty-five cents per ton, or four dollars more on a car weighing twenty tons than the rate of the Baltimore and Ohio Railroad for delivery at its terminal. The joint rate on a car of twenty tons would amount to seventeen dollars. Assuming that the distance from Frederick to Bay View Junction is eighty miles, and that the distance from Bay View Junction to Bolton Station, Baltimore, on the Northern Central Railway, is five miles, the Pennsylvania Railroad Company (the Northern Central Railway Company) would receive one and one-half cents per ton, or six dollars for the use of its terminal, and one-third of the balance, namely, three dollars and sixty-six cents, making nine dollars and sixty-six cents, and the Baltimore and Ohio Railroad Company would receive seven dollars and thirty-four cents. With the order of the Public Service Commission in force it is not probable that there would be an agreement for a joint rate for this shipment; the Baltimore and Ohio Railroad Company would receive the sixty-five cents per ton for the line haul to Bay

View Junction, amounting to thirteen dollars, less the switching charge of three dollars, if it absorbed or paid it, and the Pennsylvania Railroad Company would get only three dollars for the use of its terminal and for the same service for which it would receive nine dollars and sixty-six cents under the joint rate arrangement. While the order of the Commission would result in a loss to the Pennsylvania Railroad Company of six dollars and sixty cents on this shipment, and a gain of two dollars and sixty-six cents for the Baltimore and Ohio Railroad Company, the shipper would only save one dollar, if he was required to pay the switching charge, or four dollars if the switching charge was absorbed by the Baltimore and Ohio Railroad Company.

In the case of the *Merchants and Manufacturers' Association of Baltimore et al,* v. *Pennsylvania Railroad Company et als,* 23 I. C. C. Rep. 474, the Interstate Commerce Commission held in respect to the rates to which we have referred that except where the joint through rates were in effect the class rates collected by said railroads for the interchange of interstate traffic in carloads in the City of Baltimore were unreasonable, and that a reasonable charge for "such service ought not exceed the flat Baltimore rate by more than the following: On first and second classes, five cents per hundred pounds; on third, fourth, fifth and sixth classes, and upon commodities not moving under class rates, two cents per hundred pounds." The order of the Public Service Commission of Maryland, as we have seen, abolishes these joint rates in so far as they apply to intrastate traffic, and establishes in lieu thereof the per car switching rates therein provided.

The evidence also tends to show that about ninety per cent. of the freight to and from Baltimore City is shipped to and from points where the Pennsylvania Railroad Company, the Baltimore and Ohio Railroad Company, and the Western Maryland Railway Company compete; that the ability of one of said railroads to compete with the other depends largely upon the location, character and extent of its terminals; that a railroad company, in order to secure freight from a point

where it competes with other railroad companies and destined to terminals on their lines, would absorb or pay the switching charges fixed by the Commission out of its line-haul charge, and would not be willing to enter into a joint rate agreement; that the order of the Commission not only impairs the value of the companies' terminals as a means of securing freight, in that it enables any one of the railroad companies, by absorbing the switching charges, to compete with the others for the line-haul service, but also deprives the companies of their value as a means of securing joint rate arrangements by which they receive a share of the line-haul charges for the use of their terminals; that each of said railroads constructed and maintains its terminals for the accommodation of its own business; that at times they are not more than sufficient for that purpose, and that the effect of the Commission's order is to deprive them of the use and control of their terminal facilities.

The contentions of the several railroad companies in this case are: (1) that the Public Service Commission of Maryland has no power under the Public Service Commission Law to require them to perform the services designated "Connecting Line Switching" and "Intermediate Switching," because to require them to render such service would compel them to permit and allow other railroad companies, their competitors, "to use their tracks and terminal facilities;" (2) that to require them to perform such service, in accordance with the order of the Commission, would deprive them of their property without due process of law within the meaning of the Fourteenth Amendment to the Constitution of the United States, and (3) that the rates fixed by the Commission for the services mentioned are unreasonable and confiscatory. On the other hand, the Public Service Commission insists, (1) that the order does not require one of said railroads to allow the others to use its terminals; (2) that the order is not unconstitutional, and (3) that the switching charges prescribed are not unjust and unreasonable.

In respect to the first contention of the railroad companies, it must be conceded that at common law common carriers were not bound to give the use of their tracks and terminals to competing lines. But that the Legislature may, subject to constitutional limitations, prescribe reasonable regulations for the conduct of common carriers, and impose upon railroad companies operating within the State duties in excess of their common law obligations, and may exercise that power through a commission duly constituted for that purpose, will not be disputed, and is distinctly affirmed by this Court in the cases of *Gregg* v. *Laird,* 121 Md. 1, 87 Atl. Rep. 1111, and *Laird* v. *B. & O. R. R. Co.,* 121 Md. 193, 88 Atl. Rep. 353, and by the cases there cited, to which we need only add the case of *Louisville, &c., R. R. Co.* v. *Stock Yards Co.,* 212 U. S. 132. The first inquiry in this connection is, what is the nature of the service required by the order of the Commission? and that question being answered, it will remain to be determined whether the Act of 1910, Ch. 180, confers upon the Public Service Commission of this State the power to exact such service from the railroads involved in this controversy. The order of the Commission requires the railroad companies to establish a switching district for the City of Baltimore within the boundaries therein mentioned, and to establish rates, not exceeding the amounts therein named, for connecting line switching and intermediate switching, which are declared to be "the movement of a loaded car from any spur, track, junction, yard or terminal of one carrier to any spur, track, junction, yard or terminal of another carrier," and "the movement of a loaded car from any spur, track, junction, yard or terminal of one carrier, thence to and over the lines of another carrier, and thence to a spur, track, junction, yard or terminal of a third carrier." The movements described in the order include the movement by one carrier of a carload of freight from the point of its connection with another carrier to its own terminal, so that if a carload of freight was shipped from any point within the State over

the Pennsylvania Railroad and consigned to Camden Station, Baltimore, a terminal of the Baltimore and Ohio Railroad Company, the Baltimore and Ohio Railroad Company would be required by the order of the Commission to transfer said car from its junction with the Pennsylvania Railroad. at Bay View, to Camden Station, or if the same car was shipped from any point within the State over the Baltimore and Ohio Railroad and consigned to Calvert Station, Baltimore, a terminal of the Pennsylvania Railroad Company, the order of the Commission would require the latter railroad to haul the car from Bay View Junction to its terminal. Has the Commission the power to impose such a duty upon the railroad companies? The Act of 1910, section 15, provides "That every common carrier shall file with the Commission having jurisdiction, and shall print and keep open to public inspection, schedules showing the rates, fares and charges for the transportation of passengers and property within the State between each point upon its route and all other points thereon; and between each point upon its route, and all points on each route leased, operated or controlled by it; and between each point on its route or upon any route leased, operated or controlled by it, and all points on the route of any other common carrier, whenever a through route and joint route shall have been established or ordered between any two such points. Section 18 declares, "That every common carrier is required to afford all reasonable, proper and equal facilities for the interchange of passengers, freight and property traffic between the lines owned, operated, controlled or leased by it and the lines of every other common carrier, and for the prompt transfer of passengers and for the prompt receipt and forwarding of freight and property to and from its said lines; and no common carrier shall in any manner discriminate in respect to rates, fares or charges, or in any respect, to any service, or in respect to any charges or facilities for any such transfer in receiving or forwarding between any two or more other common carriers or between passen-

gers, freight or property destined to points upon the lines of any two or more other common carriers, or in any respect with reference to passengers, freight or property transferred or received from any two or more other common carriers. This section shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks or terminal facilities. Every common carrier, as such, is required to receive from every other common carrier, at a connecting point, freight cars of proper standard, and haul the same through to destination, if the destination be upon a line owned, opeated or controlled by such common carrier, or if the destination be upon a line of some other common carrier, to haul any car so delivered through to the connecting point upon the line owned, operated, controlled or leased by it, by way of route over which such car is billed, and there to deliver the same to the next connecting carrier. Nothing in this section shall be construed as in anywise limiting or modifying the duty of a common carrier to establish joint rates, fares and charges for the transportation of passengers, freight and property over the lines owned, operated, controlled and leased by it and the lines of other common carriers, nor as in any manner limiting or modifying the power of the Commission to require the establishment of such joint rates, fares and charges. A railroad corporation and a street railroad corporation shall not be required to interchange cars except on such terms and conditions as the Commission may direct."

The latter section provides that it shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks or terminal facilities, and the precise contention of counsel for the Pennsylvania Railroad Company is stated in their brief as follows: "While it may be safely admitted by the appellees that under the provisions of section 18 of the Public Service Commission Law, the appellees may be required by the Commission to accept *cars of freight* at *junction points* on their *lines* (main roadway) within the State of Maryland, from other railroad

companies, and *haul* the same to *destination* and *deliver* the
same on appellees' *terminals,* if the destination *is not reached*
by the *other* carriers' lines; and the junction point *is not
near* the appellees' *terminals;* and the other *carriers* are not
competitors with the appellees from the point where the
shipment originated to the *destination;* and that the appel-
lees with regard to that service would be subject to all the
provisions of sections 13, 16, 18, and 23 of the Public Serv-
ice Commission Law, as respect rates and otherwise; yet,
since the order in this case requires the appellees to *accept
cars* from *other carriers* at *junction points* not only near, but
*right on* and at the appellees' terminals in Baltimore City—
if the appellees should submit to the order of the Commis-
sion in this case .with respect to 'Connecting Line Switch-
ing' and 'Intermediate Switching,' they would be submitting
to an order which deprives them of their property without
due process of law and which requires them to allow their
competitors to use their yards and tracks and other terminal
facilities within and immediately without the City of Balti-
more"

In support of this contention the railroad companies rely
upon the cases of *Little Rock and M. R. Co.* v. *St. Louis,
I. M. and S. Ry. Co.,* 59 Fed. Rep. 400; *Oregon Short-Line
and U. N. Ry. Co.* v. *Northern Pac. Ry. Co.,* 61 Fed. Rep.
158; *Central Stock Yards Co.* v. *L. and N. R. R. Co.,* 192
U. S. 568; and *L. and N. R. R. Co.* v. *Central Stock Yards
Co.,* 212 U. S. 132. In the first of these cases the Court
said: "The effect of granting the relief asked would be to
put the plaintiff in a position where it could receive inter-
state freight at Memphis, Tenn., destined to Fort Smith,
Ark., bring such freight a distance of 135 miles to Little
Rock, over its own line, there deliver it to the Little Rock &
Ft. Smith road, to be taken a further distance of 160 miles,"
and in the case of *Oregon Short-Line and U. N. Ry. Co.* v.
*Northern Pac. Ry. Co., supra,* the Court held, "that the
refusal to transport freight in foreign cars, where the freight
originated east of the ninety-seventh meridian, when its own

cars were not in use, but were free to be employed in the transportation desired, where a transfer of freight would not have been injurious to it, can in no respect be deemed an unreasonable discrimination against complainant or a denial to it of reasonable or proper facilities." But counsel in their brief admit that the companies they represent may be required to receive carloads of freight from another line at a junction and haul the same to its terminal, provided the said junction is not at or near its terminal, and the other railroad is not a competing line. In the case of the *Cent. Stock Yards Co.* v. *Louisville, etc., Ry. Co., supra,* the Court held, that the appellee could not be required to accept live stock for delivery at the stock yards of another railroad in Louisville in the neighborhood of its own stock yards. In its opinion the Court said: "Suppose that the Southern Railway station and the Louisville & Nashville station were side by side, and that their tracks were connected within or just outside the limits of the station grounds. It could not be said that the defendant was giving an undue or unreasonable preference to itself or subjecting its neighbor to an undue or unreasonable disadvantage, if it insisted on delivering live stock which it had carried to the end of the transit at its own yards. * * * If the cattle are to be unloaded, then, as was said in *Corington Stock Yards Company* v. *Keith* (139 U. S. 128), the defendant had a right to unload them where its appliances for unloading are, and cannot be required to establish another set hardby. On the other hand, if the cattle are to remain in the defendant's cars, it cannot be required to hand those cars over to another railroad without a contract, and the courts have no authority to dictate a contract to the defendant or require it to make one. * * * The requirement to deliver, transfer and transport freight to any point where there is a physical connection between the tracks of the railroad companies must be taken to refer to cases where the freight is destined to some further point by transportation over a connecting line. It could not be intended to sanction the snatching of the freight from the

transporting company at the moment and for the purpose of delivery. * * * It may be that a case could be imagined in which carriage to another station in the same city by another road fairly might be regarded as *bona fide* further transportation over a connecting road and within the requirements of the Kentucky Constitution. However that may be, we are of the opinion that the Court below was entirely right, so far as appears, in treating this an ordinary case of stations at substantially the same point of delivery, and, therefore, as one to be dealt with as if they were side by side. As the defendant would not be bound to deliver to the Central Stock Yards if they were by the side of its track, its obligation is no greater because of the intervention of a short piece of the track of another railroad. As we have said, the delivery would have to be made either by unloading or by the surrender of the defendant's cars." In the case of *Louisville, etc., R. R. Co.* v. *Central Stock Yards Co., supra,* the order appealed from required the railroad company to deliver its cars loaded with freight to the Southern Railway for delivery to the latter's stock yards at Louisville, and the Supreme Court, in reversing the order, said: "In view of the well-known and necessary practice of connecting roads, we are far from saying that a valid law could not be passed to prevent the cost and loss of time entailed by needless transshipment or breaking of bulk, in case of an unreasonable refusal by a carrier to interchange cars with another for through traffic. * * * It is enough to observe that such a law perhaps ought to be so limited as to respect the paramount needs of the carrier concerned, and at least could be sustained only with full and adequate regulations for his protection from the loss of undue detention of cars, and for securing due compensation for their use. The Constitution of Kentucky is simply a universal undiscriminating requirement, with no adequate provisions such as we have described. The want cannot be cured by inserting them in judgments under it. The law itself must save the parties' rights, and not leave them to the discretion of the courts as

such. * * * We do not mean, however, that the silence of
the Constitution might not be remedied by an act of the
Legislature or a regulation by a duly authorized subordinate
body if such legislation should be held consistent with the
State Constitution by the State Court. * * * There remains
for consideration only the third division of the judgment,
which requires the plaintiff in error to receive at the connect-
ing point, and to switch, transport and deliver all live stock
consigned from the Central Stock Yards to anyone at the
Bourbon Stock Yards. This also is based upon the sections
of the Constitution that have been quoted. If the principle
is sound, every road in Louisville, by making a physical con-
nection with the Louisville & Nashville, can get the use of
its costly terminals and make it do the switching necessary
to that end, upon simply paying for the service of carriage.
The duty of a carrier to accept goods tendered at its station
does not extend to the acceptance of cars offered to it at an
arbitrary point near its terminals by a competing road, for
the purpose of reaching and using its terminal station. To
require such an acceptance from a railroad is to take its
property in a very effective sense, and cannot be justified,
unless the road holds that property subject to greater liabili-
ties than those incident to its calling alone. The Court of
Appeals did not put its decision upon any supposed special
liability, but upon the broad ground that the State Constitu-
tion requires it, and lawfully may require it of a common
carrier by rail." The effect of the decisions in the last two
cases is that a railroad company cannot be required to de-
liver to another railroad company at a junction, at or near
its terminal, carloads of freight for delivery at the terminal
of a competing line, where the terminal of the latter is at or
near the terminal of the former, and cannot be required to
receive such freight from a connecting line, at a point of
connection at or near its terminal, for delivery at its ter-
minal. They do not hold that a railroad company may not
be required to receive from another carrier at the point of
connection carloads of freight consigned to its terminal, and

the point of the latter decision is that it cannot be required to do so where the point of connection is at or by the side of its terminal, and where no adequate provision is made for compensation for the use of its terminal. As we have said, it is admitted that a common carrier may be required to receive a car from another road and haul the same to its terminal, provided the point of connection is not near its terminal, and it is said in *Central Stock Yards* v. *Louisville, etc., Ry. Co., supra,* that carriage to another station in the same city might be regarded as *bona fide* further transportation over a connecting road and within the requirements of law. The question, then, is, under what circumstances should the transportation of carloads of freight by a railroad from its connection with another to its terminal be regarded as transportation as distinguished from delivery to said railroad for the purpose of getting the use of its terminal or terminal facilities? As has been stated, the point of connection of the Baltimore & Ohio Railroad with the Pennsylvania Railroad (Northern Central) is at Bay View Junction. The Baltimore & Ohio Railroad does not connect directly with the Western Maryland Railway within the switching district fixed by the order of the Commission, but the latter road connects with the Pennsylvania road at Fulton Junction. The distances between Bay View and the following points on the Baltimore & Ohio Railroad, within the switching district, are as follows: Canton, 2.5 miles; York Road, 3.6 miles; Huntington Avenue, 4.4 miles; Oak Street, 4.7 miles; Camden Station, 6.9 miles; Mount Clare, 14.2 miles; Curtis Bay, 16.1 miles, and Locust Point, 11.3 miles. The distance between Bay View and Calvert Station, on the Pennsylvania Railroad, is 6.3 miles. So that a car reaching Baltimore on the Pennsylvania Railroad for delivery at Camden Station would have to be hauled by the Baltimore & Ohio Railroad about seven miles to its destination. and a carload of freight shipped to Baltimore over the Baltimore & Ohio Railroad and consigned to Calvert Station would have to be moved by the Pennsylvania Railroad about

six and one-half miles to the point of delivery. Should such movements of carloads of freight be regarded as switching movements, involving the use of the delivering carrier's terminal facilities, within the meaning of the cases referred to in 192 U. S. and 212 U. S., and the prohibition of section 18 of the Maryland Act and section 3 of the Interstate Commerce Act, or should they be treated as *bona fide* further transportation such as the Maryland Commission may lawfully require, and such as is referred to in 192 U. S. as "*bona fide* further transportation" from one station in a city to another station in the same city? In 192 U. S. and 212 U. S., the stock yards of the two railroad companies were treated as being side by side, or practically so, and in the latter case it was said that the effect of requiring one of said railroads to haul a carload of live stock over short pieces of its track from its connection with the other to its stock yards was to give the other road the use of its terminal. But in a large city with a population of over half a million and covering many square miles of territory, there is logically no more reason for holding that the movement of a carload of freight by a common carrier from its connection with another to its destination on its line involves the use of its tracks and terminal facilities or the taking of its property, than it would be for holding that such would be the result of the transportation by a common carrier of a car of freight for the distance of seven miles from the point of its connection with another to its station in the open country. To require the movement in either case would, in an extreme sense, require one road to give the other the use of its tracks and terminal facilities, but it can not be so regarded in the sense that such a requirement is not within the authority of the State, in the exercise of the police power, to prescribe reasonable regulations and to establish reasonable rates, to the end that common carriers may subserve the public good and public convenience. In the case of *Wis., etc., R. R. Co.* v. *Jacobson,* 179 U. S. 287, the Supreme Court held that one railroad company could under the Minnesota law be required

to make a connection with another road, notwithstanding it required the condemnation by it of land outside of its property. If such a requirement is within the scope of reasonable regulation, involving as it did the appropriation of the carrier's money for the acquisition of the necessary land, etc., how can the hauling of a carload of freight a distance of seven miles by a carrier from its connecting point with another railroad to its station be regarded as the taking of its property without due process of law or as requiring it to give the use of its tracks and terminal facilities to the road from which it received the freight, where reasonable compensation is provided for such service? In the case of *Grand Trunk Ry. Co.* v. *Michigan R. R. Com.,* decided December 8th, 1913, 231 U. S. 457, to which our attention has been called since the argument of this case, the Supreme Court of the United States was considering the Statute of Michigan, which contained the following provisions: "All railroads, subject to the provisions of this Act, shall afford all reasonable and proper facilities by the establishment of switch connections between one another and the establishment of depots and otherwise for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith, and shall transfer and deliver without unreasonable delay or discrimination any freight or cars or passengers destined to any point on its own line or on any connection line, and shall not discriminate in their rates and charges between such connecting lines; provided precedence may be given to live stock and perishable property. Nothing in this Act shall be construed as requiring any railroad to give the use of its tracks or terminal facilities to another railroad engaged in like business," etc. "Every common carrier operating within the State shall receive and transport at reasonable rates any and all carload traffic offered for transportation under the usual conditions locally consigned between points in the same city or town, and shall receive and transport at reason-

382        PUB. S. COM. vs. N. C. RWY. CO.

Opinion of the Court.                [122

able rates from any junction point or transfer point or intersection with another railroad in such city or town any and all such carload freight destined to team tracks or other sidings on any line operated by the delivering carrier, and shall deliver such car or cars upon such team tracks or sidings in the city or town where such car or cars are received from such connecting line, when required so to do."

The railroad companies published a tariff cancelling their rates for the service referred to in the second above-mentioned section, and the Michigan Railroad Commission having suspended the tariff, the railroad companies applied to the District Court to have the order and the statute, in so far as they required them to perform said service, declared null and void, and for an injunction restraining the execution of the Commission's order. The district Court refused the relief prayed and the railroad companies appealed. It was claimed by the companies that to require them to perform the service mentioned in said section would constitute the taking of their property without due process of law within the meaning of the 14th Amendment to the Constitution of the United States, and would require them to give the use of their terminal facilities to other carriers engaged in like business. The Supreme Court refused to adopt their view, and in the course of its opinion said: "The extent of Detroit is about 22 miles, and its population is over five hundred thousand. The effect of the order is simply that the company shall accept freight at the designated points for shipment to the other designated points. This, except in an extreme sense, is not a use of the tracks and terminals; or, rather, is only a proper use—the use for which the roads were constituted to afford. An area of 22 miles is attempted by the appellants to be localized and made a destination point. A city may, in a sense, be such a terminal unit, but considering the extent of Detroit, it is competent, we think, for the State under the conditions which this record presents, to consider points within it the beginning and destination of traffic. And to call the service necessary to such interstate movement of freight, a taking

of terminals, is misleading, and puts out of view the full
signification of the question which the record presents, which
is, Is there a distinct and sufficient movement between places
which the companies can be required to perform, or which,
to put it another way, constitutes transportation and there-
fore such as the companies were created to perform? That
cars may be delivered or received is but an incident. The
statute, therefore, is a regulation of the business of appel-
lants, and not an appropriation of their terminal facilities
for the use and benefit of other roads." After referring to the
case of *Wis. & R. R. Co.* v. *Jacobson, supra,* the opinion pro-
ceeded as follows: "It (referring to the last mentioned case)
rested upon the ultimate proposition that railroad com-
panies 'are organized for the public interests and to subserve
primarily the public good and convenience.' And deciding
this to be the purpose of the creation of the roads and that the
government had power to secure it, it was held that where a
provision and regulation is reasonable and appropriate, when
considered with regard to the interest both of the company
and of the public, the legislation is valid and will furnish
ample authority for the Courts to enforce it, even though
eminent domain must be exercised or cost incurred. This
principle, illustrated by the facts of the case, is apposite to
the regulation under review. If the establishment of track
connections by intersecting roads with its necessary acces-
sories of sidings and switches and an acceptance and delivery
of loaded cars can be required as a convenience of transporta-
tion, surely team tracks and sidings in Detroit and the deliv-
ery and acceptance of loaded cars are as much so."

"This view is not opposed by *Louisville, etc., R. R. Co.* v.
*Stock Yards Co.,* 212 U. S. 132. There a provision of the
Constitution of the State of Kentucky, which required a car-
rier to deliver its cars to a connecting carrier, was held in-
valid because it did not provide adequate protection for their
return or compensation for their use. It was hence held that
it amounted to a taking of property without due process of
law. But the Court was careful to say, that 'in view of the

well-known and necessary practice of connecting roads, we are far from saying that a valid law could not be passed to prevent the cost and loss of time entailed by needless transshipment or breaking of bulk, in case of an unreasonable refusal by a carrier to interchange cars with another for through traffic.' The point of the decision was that compensation should be provided, and by the law. As it is expressed in the opinion,—'the law itself must save the parties' rights, and not leave them to the discretion of the Courts.' This as a condition was explained, for it was said: 'We do not mean, however, that the silence of the (State) constitution might not be remedied by an Act of the Legislature, or a regulation by a duly authorized subordinate body, if such legislation should be held consistent with the State constitution by the State Court.' These conditions exist in the case at bar. There is another part of the *Louisville, etc., R. R.* v. *Stock Yards Case* which is more applicable to the contentions of the parties hereto and determine, it is urged, against the statute under consideration and the order of the Commission. The judgment reviewed required the railroad company to receive at its connection with the Southern Railway Company and to switch, transport and deliver all live stock consigned from the Central Stock Yards (the stock depot of the Southern Railway), to anyone at the Bourbon Stock Yards (the stock depot of the Louisville & Nashville Railroad). This part of the judgment was based also upon the constitution of the State. We said: 'If the principle is sound, every road in Louisville, by making a physical connection with the Louisville and Nashville, can get the use of its costly terminals, and make it do the switching necessary to that end, upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminals by a competing road, for the purpose of reaching and using its terminal station.' " * * *

"It will be observed that the beginning of traffic was at the Central Stock Yards, the stock yards of the Southern, and

was to be hauled by that road to its connection with the Louis-
ville and Nashville, and by the latter from that point to the
Bourbon Stock Yards, the stock depot of the latter railroad.
The yards were the terminals of the respective roads for live
stock delivery, and the case turned upon the point that the
roads were competitive, and that the point of delivery was an
arbitrary one, and that thereby the terminal station of one
company was required to be shared with the other company."

"In the case at bar a shipper is contesting for the right as
a part of transportation. The order of the Commission was
a recognition of the right, and legally so. Considering the
theatre of the movements, the facilities for them are no more
terminal or switching facilities than the depots, side tracks
and main lines are terminal facilities in a less densely popu-
lated district. A precise distinction between facilities can
neither be expressed nor enforced. Transportation is the busi-
ness of railroads, and when that business may be regulated,
and to what extent regulated, may depend upon circumstances.
* * * Indeed, no case could better illustrate the value of the
principle than does this case, where the exceptional situation
of Detroit as shown by the record, the relation of the tracks
in controversy to that situation, their length and their func-
tions, as respects the commerce of Detroit, which in the nature
of things they perform, not merely as instruments of term-
inal service and delivery, but of railway transportation in the
completest sense, are essential and controlling factors in the
determination of the question presented. To which controll-
ing conditions there must, of course, be added the fact that
the railroad itself for a long period of time had recognized
the situation and had applied the tracks to uses of transporta-
tion in the proper sense. as distinguished from mere terminal
service, a use which was only abandoned or sought to be
abandoned when authority was exerted to prevent unreason-
able and to secure reasonable charges for the services."

We have quoted from the above case at length because it
reviews the cases relied on by counsel for the railroad com-
panies as controlling in this, and because it clearly points out

VOL. 122    25

the distinction between those cases and the case at bar, and illustrates the principle that should be here applied. In view of the conditions in Baltimore City, the extent of the movements referred to in the order of the Commission, we think the latter must properly be regarded as transportation, subject to reasonable regulation by the Commission, and that to require such service, *where reasonable compensation is provided,* would not, as urged by the companies, involve the taking of their property without due process of law, or require them to give the use of their tracks or terminal facilities to other carriers, within the meaning of section 18 of the Maryland Act.

It is said in *Baltimore Belt Railroad Company* v. *Baltzell,* 75 Md. 94, that "the law of the land," in the Constitution of this State, and "due process of law," in the Fourteenth Amendment to the Constitution of the United States, "means the same thing."

The section of the charter of the Baltimore and Ohio Railroad Company (Act of 1826, Ch. 123), which declares that "it shall not be lawful for any other company, or any person or persons whatsoever to travel upon or use any of the roads of said company, or to transport persons, merchandise, produce or property of any description whatsoever, along said roads or any of them, without the license or permission of the president or directors of said company," and which was held to be a contract in *Pennsylvania R. R. Co.* v. *Baltimore and Ohio R. R. Co.,* 60 Md. 263, would not be violated by the order of the Commission, if just compensation was provided. That order does not authorize any person to travel upon or use any of the roads of that company, within the meaning of said Act, but, reasonable compensation being provided, would be a lawful regulation of the public service for which the company was chartered.

This brings us to a consideration of the contention that the rates fixed for the several movements provided for in the order of the Commission are unreasonable and unjust.

The evidence produced before the Commission was offered in evidence at the trial in the Court below, and was objected to by the Pennsylvania Railroad Company. Section 43 of the Act of 1910 provides, "that any corporation subject to this Act, or any of the provisions of this Act, and any person in interest being dissatisfied with any order of the Commission fixing any rate or rates, tolls, charges, schedules, joint rate or rates, or any order fixing any regulations, practices, acts or service, may commence any action in the Circuit Court for any county, or before any judge of the Supreme Bench of Baltimore City, in any Court of Baltimore City of appropriate jurisdiction which may be adopted for the purpose, against the Commission as defendant to vacate and set aside any such order on the ground that the rate or rates, tolls, charges, schedules, joint rate or rates, fixed in said order is unlawful, or that such regulation, practice, act or service fixed in such order is unreasonable, in which action a copy of the complaint shall be served with the summons." Section 44 is as follows: "That if, upon the trial of such action, evidence shall be introduced by the plaintiff, which is found by the Court to be different from that offered at the hearing before the Commission, or any Commissioner, or additional thereto, the Court, before proceeding to render judgment, unless the parties to such action stipulate in writing to the contrary, shall transmit a copy of such evidence to the Commission and shall stay further proceedings in said action for fifteen days from the date of such transmission. Upon the receipt of such evidence the Commission shall consider the same and may alter, modify, amend or rescind its order relating to such rate or rates, tolls, charges, schedules, joint rate or rates, regulations, practice, act or service complained of in said action, and shall report its action thereon to said Court within ten days from the receipt of such evidence. If the Commission shall rescind its order complained of, the action shall be dismissed; if it shall alter, modify or amend the same, such altered, modified or amended order shall take

the place of the original order complained of, and judgment shall be rendered thereon as though made by the Commission in the first instance.   If the original order shall not be rescinded or changed by the Commission, judgment shall be rendered upon such original order."

The evident intention of the Legislature, expressed in these sections, was that the Court, in considering the question of the unreasonableness of the rates fixed by the Commission, should have before it the evidence produced before the Commission, for otherwise it could not comply with the provisions of section 44, and we think the objection was properly overruled by the Court below.

It must be observed that the power of the Commission to fix reasonable rates, etc., is legislative—*Gregg* v. *Laird, supra*—and that the functions of the Court in reviewing the actions of the Commission are distinctly judicial, and are exercised only for the purpose of determining whether such action of the Commission is unreasonable or unlawful.   Section 46 of the Act declares: "That in all trials, actions, and proceedings arising under the provisions of this Act, or growing out of the exercise of the authority and powers granted herein to the Commission, the burden of proof shall be upon the party adverse to such Commission, or seeking to set aside any determination, requirement, direction or order of said Commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the Commission, complained of, is unreasonable or unlawful, as the case may be."   Upon an application to the Court for an injunction restraining the execution of an order of the Commission, the Court has no authority to determine what would be a reasonable rate for the service required, or to establish rates, but its power is limited to the determination of the question whether the rates fixed by the Commission are unreasonable or unlawful, and until it is made to appear by *clear* and *satisfactory* evidence that the action of the Commission is unreasonable or unlawful, the

Court is without power to impose any restrictions upon the
execution of the Commission's order.  Under section 44, the
evidence taken before the Court was referred to the Commis-
sion, and the Commission having refused to modify its pre-
vious order, that order stands as if based upon all the evi-
dence in the case.

We have already pointed out the result, as to the railroad
companies and shippers, of the joint rate arrangements as
compared with the per-car switching charges fixed by the
Commission.  The evidence adduced before the Commission
for the purpose of showing what would be reasonable rates
for the service prescribed consisted chiefly of the testimony
of experts as to what would be reasonable charges for the
several movements of freight mentioned, and evidence show-
ing that in many other cities similar, and in some instances
lower, charges for the same or like services are in force.
While the latter does not show that the conditions at the
points named are, in all respects, the same as the conditions
existing in Baltimore City, it is, nevertheless, entitled to
some weight in considering the unreasonableness of the rates
in question.  *In re Divisions of Joint Rates,* 10 I. C. C.
Rep. 385; *Sinaiko Brothers* v. *Chicago, M. and St. P. Ry.
Co.,* 4 Wis. R. R. Rep. 432; *Detroit Tariff Asso.* v. *L. S. and
M. S.,* 21 I. C. C. Rep. 257.

The evidence produced by the railroad companies before
the Commission and before the Court below shows that they,
in their joint rate agreements, placed a higher value upon
such services.  They also offered evidence in the Court below
to show that the actual cost of the movements mentioned in
the order of the Commission is in excess of the rates pre-
scribed.  This evidence was excluded by the Court below,
but we think it should have been admitted.  It is difficult,
of course, to ascertain with absolute accuracy the cost of any
particular service by railroad companies, which must acquire
and maintain the necessary equipment and facilities for the
accommodation of the business of its entire system.  But the
fact that such testimony may not be strictly accurate does

not determine its admissibility. Nor does the fact that the estimate. of the witness must be based upon data furnished by the records of the railroad company not under his immediate control and supervision, or the result of his own work or observation, render such evidence inadmissible; *Chicago, M., etc., Ry.* v. *Tompkins,* 176 U. S. p. 167. This evidence consists of the opinions of experts, based upon calculations made by them of the costs of the service required and offered in evidence, and while its accuracy may not be susceptible of mathematical demonstration, we think it shows that the rates fixed by the Commission for connecting line and intermediate switching are unreasonable in view of the fact that they enable any one of said railroads to get the use, in one sense, of the terminals of the others, by paying only what, it appears, would not be more than a reasonable charge for the service of carriage from the point of connection to the terminal to which the freight is consigned. While we think that the movements required by the order from the junction point of any two of said roads to their terminals should be regarded as transportation, and subject to regulation by the Commission, we do not think that they can be required to perform such service except upon payment of a reasonable charge for the service of carriage and use of their terminals. We can not adopt the view that common carriers may be required to perform services at rates less than the actual costs of such services, for that would amount to confiscation, and would ultimately defeat the very ends they are designed to accomplish, namely, to subserve the public good and public convenience.

The Public Service Commission has the power to establish through routes and joint routes and rates and joint rates, and section 18 declares that the provisions of that section shall not be construed to limit the power of the Commission to establish joint rates. The joint rate agreements we have referred to indicate the principle upon which reasonable rates for the services required and defined as connecting line and intermediate switching should be established. This

view, as well as the principle upon which such services may be required and the rates therefor should be established, is approved by and clearly shown in the recent case of *Waverly Oil Works Co.* v. *Pennsylvania Railroad Co. et als.*, decided by the Interstate Commerce Commission, December 3rd, 1913 (28 I. C. C. 621), to which our attention has also been called since the argument of this case.

In regard to *yard* switching and *industrial* switching, which do not involve the use by one carrier of the terminal facilities of the others, we think the evidence fails to show that the rates prescribed by the Commission are *unreasonable*.

The rule that controls the Federal Courts in reviewing the action of commissions authorized to establish reasonable rates is stated in the following cases: *I. C. C.* v. *L. and N. R. R. Co.*, 227 U. S. 88; *I. C. C.* v. *U. P. R. R. Co.*, 222 U. S. 547; *Cincinnati, etc., Ry. Co.* v. *I. C. C.*, 206 U. S. 142. In the case of *I. C. C.* v. *U. P. R. R. Co.*, *supra*, the Court said: "In determining these mixed questions of law and fact, the Court confines itself to the ultimate question as to whether the commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony it would have made a similar ruling. 'The findings of the Commission are made by law *prima facie* true, and this Court has ascribed to them the strength due to the judgment of a tribunal appointed by law and informed by experience.' *Ill. Cent.* v. *I. C. C.*, 206 U. S. 441. Its conclusion, of course, is subject to review, but when supported by evidence, is accepted as final; not that its decision, involving as it does so many and such vast public interests, can be supported by a mere scintilla of proof—but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

The provisions of the Statute of Wisconsin are like the provisions of the Maryland law. In the case of *M., St. P. and L. S. M. R. Co.* v. *Railroad Commission*, 136 Wis. 146, the Supreme Court of Wisconsin said: "Unless the plaintiff is able to show by clear and satisfactory evidence that the

order of the commission complained of is unlawful or unreasonable, as the case may be, the order must stand"; and "in the review of the questions of fact it must, under the rules here found, require a very strong case to establish unreasonableness by evidence clear and satisfactory to the Circuit Court. Like the United States Supreme Court, we accord to the orders of the Railroad Commission the weight due to the decision of a tribunal authorized by law and informed by experience."

The Maryland Statute confers upon the Commission broad powers and discretion, and while it requires the Court, upon application to it, to determine whether the rates fixed by the Commission are unreasonable or unlawful, it declares that the Commission's order shall not be disturbed except upon clear and satisfactory evidence that it is unreasonable or unlawful. Where the evidence produced by the party alleging the unreasonableness of the order is not of such a character, the Court is without power to enjoin its execution.

It is not necessary to consider the other exceptions to the evidence, as a different view as to them than that expressed by the Court below would not affect the result of these appeals.

We have carefully examined the authorities cited and relied on by counsel in their very able and extensive briefs, but the law applicable to the facts of this case does not justify a conclusion other than the one we have reached.

For the reasons stated we hold that that part of the order of the Commission which refers to connecting line and intermediate switching is unlawful, because the rates fixed by the order for such services are unreasonable, and that it does not appear that the rates fixed for yard and industrial switching are unreasonable. We must therefore affirm the decree of the Court below.

*Decree affirmed, each party to pay one-half the costs in this Court.*