PUBLIC SERVICE COMMISSION *v.* UNITED RAILWAYS & ELECTRIC COMPANY OF BALTIMORE.

[No. 52, April Term, 1928.]

573

574

*Decided July 16th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Thomas J. Tingley* and *Raymond S. Williams,* for the Public Service Commission.

*Joseph C. France, Charles McHenry Howard,* and *Charles Markell,* with whom was *Henry H. Waters* on the brief, for the United Railways & Electric Company.

*Carville D. Benson, James K. Cullen,* and *Carville D. Benson, Jr.,* filed a brief on behalf of communities of Hale-thorpe, Arbutus, and Leeds.

OFFUTT, J., delivered the opinion of the Court.

The United Railways & Electric Company of Baltimore came into existence on the fourth day of March, 1899, as the result of a merger of all the street railway lines operating in and near Baltimore, with a total authorized capitalization of $76,000,000, of which $38,000,000 was in bonds, $14,000,-000 in preferred stock, and $24,000,000 in common stock. The base fare at that time charged by its several constituent companies within the city limits was five cents, and by chapter 313 of the Acts of 1900, the consolidated corporation, hereinafter called the company, was specifically limited to a fare of five cents for the transportation of adults, and three cents for children, from any point on its lines within said city to any other point thereon which could be reached directly or by transfer at intersecting points, and that schedule it maintained until 1918.

In the meantime, the State, moving with a growing trend throughout the country, had abandoned its traditional policy of regulating public service corporations by direct legislative action, and had by chapter 180 of the Acts of 1910 created the Public Service Commission of Maryland, hereinafter called the commission, to which it had committed plenary powers in respect to regulating the rates and service of public utilities, and had repealed existing legislation fixing rates for service furnished by such utilities, such repeal to become effective when and as the commission determined in accordance with the law that such rates should be superseded by others. *Gregg v. Public Serv. Commn.,* 121 Md. 30.

And on July 19th, 1918, the company for the first time applied to the commission for its approval of a schedule of rates under which it would receive six cents for adults, and a uniform increase of one cent from children between four and twelve years of age and riders using commutation tickets. The commission was unable to hear the application immediately, and the company, on August 28th, 1918, with the assent of the commission, filed a revised schedule, which took effect October 1st, 1918, and remained in effect until January 7th, 1919, when it was formerly approved by the commission.

On May 23rd, 1919, the company applied for a further increase from six to seven cents for cash fares, with four tokens for twenty-five cents, which it subsequently changed to a request that it be permitted to collect a cash fare of ten cents with two tokens for fifteen cents, and on September 30th, 1919, it was permitted to charge a cash fare of seven cents or six and one-half cents when tickets or other tokens were purchased. On December 26th, 1919, it again applied for an increase in its rate schedule, and the commission advanced the base fare from six and one-half cents to seven cents flat. On March 31st, 1924, at the company's request, the commission authorized a further increase of the base fare to seven and one-half cents, and, on August 1st, 1927, it filed an application for permission to increase its base fare to ten cents, which was 100 per cent. more than it had charged prior to October 1st, 1918, and 33 1/3 per cent. more than it had been allowed to charge from March 31st, 1924, until it filed that application; and, in connection with that request, it alleged an apprehended financial crisis, and urged that it be allowed to put the increase in effect immediately as an emergency measure, pending any hearing that might be had on its application for a permanent increase of its base fare to ten cents. The application for an emergency rate was denied but, on February 10th, 1928, the commission passed an order which denied the application for an increase of the base fare to ten cents, but which permitted the company "to charge and

collect for the transportation of persons over its several street railway lines, in Baltimore City and vicinity, a base rate fare of eight and one-third cents when tickets or fare checks are purchased, or nine cents cash, for the conveyance of each passenger over twelve years of age, and five cents for each child between the ages of four and twelve years, between any of the points designated in the schedule of the said company filed with the commission pursuant to the requirements of the commission's Order No. 8240 entered in Case No. 1682 on May 26th, 1924, or between intermediate points, in either direction, on any of such lines, except in so far as the zones on any of the said lines are hereinafter modified or changed. That the first fare zone on the Halethorpe line be and it is hereby extended to the terminus of the said line at Halethorpe, effective from and after midnight of February 12th, 1928."

The company, being dissatisfied with that order, on March 13th, 1928, filed, in Circuit Court No. 2 of Baltimore City, a bill of complaint, in which it asked that that order be nullified in so far as it or any previous order of the commission prevented it from charging a flat ten cent fare, or from continuing the first and second Halethorpe zones, and it further asked that the commission be enjoined from enforcing that order or any prior order limiting the company's rates. The commission answered, the case was set down, evidence offered by the commission, the company, and intervening persons interested in the matter, and after argument submitted for decree, and on May 11th, 1928, a decree was filed vacating the order in so far as the same purports to limit the rates of the plaintiff; except, however, as to that portion of said order which extended the first fare zone on the Halethorpe line to the terminus of said line at Halethorpe, as to which latter provision in said order "the bill of complaint is hereby dismissed," and enjoining the defendants from enforcing that or any other orders of the commission in so far as they limit or purport to limit the rates of fare to be charged by the company. From that decree the company and the com-

mission appealed, the company on the ground that the court erred in abolishing the second zone on the Halethorpe line, and the commission on the ground that the court erred in vacating so much of its order as affected the rate of fare to be charged by the company, and in enjoining it from enforcing such order.

It may be noted that the relief granted in the decree is not precisely that prayed in the bill. The commission by its order did three things, it refused the company's application for a ten cent fare, it fixed an eight and one-third cents fare, and it consolidated the two Halethorpe zones in one. The appellee, in its bill, asks that all orders of the commission which limit its rates or prevent it from charging a ten cent fare be set aside, and that the commission be enjoined from enforcing any such orders. The decree does not refer to a ten cent fare at all, but vacates all orders of the commission, so far as they purport to limit the "rates of the plaintiff," and it based that ruling upon the commission's "election" not to have the case remanded to them. But the court clearly had no right to fix the company's rates, since its function was judicial and confined to determining whether the order of the commission was valid or invalid, and, if in its judgment the action of the commission was unlawful, it should have remanded the case to the commission for such further action as might be appropriate, for even if in fact the eight and one-third cent rate allowed was inadequate to allow the company a fair return on the value of its property, that fact did not oust the jurisdiction of the commission to fix the company's rates, nor did it authorize the court or the company to fix them, for under the statute the power to do that is in the commission alone. *Gregg v. Pub. Serv. Comm., supra; Chenoweth v. Pub. Serv. Comm.,* 143 Md. 626; *Havre de Grace Bridge Co. v. Pub. Serv. Comm.,* 132 Md. 24; Code, art. 23, sec. 375. But, as the decree reads, it not only vacates the order of the commission of February 10th, 1928, but in effect all other orders affecting the company's rate schedules, and it therefore either terminates this proceeding entirely

and leaves the company free to file a new application for increased rates, or it leaves the question of rates altogether at the discretion of the company. But neither of those alternatives was authorized by anything in the statute, but, if the order was invalid because it was unfair, confiscatory, unlawful, or for any reason, it should have been vacated and the case remanded to the commission, for further proceedings in accordance with such guides, rules, and standards as the court might by appropriate order or decree direct.

The central dominating question presented by the appeal is whether the schedule of rates promulgated by the commission is insufficient to yield such an income as will give to the company a fair return on the value of its property. In the argument of the case it was said that the commission had limited the company to a return of 6.26 per cent. on the value of its property, but the order did not so state. What it did do, was to fix a schedule of rates which, after deducting the allowances approved by the commission for maintenance, replacement, operation, financing, and other expenses, would yield that return, but, if more efficient or economical management resulted in a larger net return, there was nothing in the order to prevent the company from retaining the benefit of that saving, even though it increased its net earnings to more than 6.26 per cent. of the value of its property. So that the question actually is whether a schedule of fares which, after deducting all reasonable and proper expenses for the management and operation of the company, permits it to earn a net return of 6.26 per cent. on the value of its property, is confiscatory within the meaning of the state and federal constitutions, or unlawful and unreasonable within the meaning of the statute creating the commission. To that question there are various approaches, all differing in some degree in the effect they have upon the meaning and weight of the facts of the case.

It may be approached from the company's point of view, in which case the commission's function would be largely administrative, and the ultimate determination of the pro-

priety of its rates would rest with the company, and the sole test of the lawfulness of such rates would be whether they were fair to it, and would yield what in its judgment was a proper return on the valuation of its property.

It may be approached from the standpoint of the patrons of the service, in which event the power of the commission to fix the rates would be bounded on one side by the rule that the rates must in no event exceed the value of the service, and on the other by the rule that, so long as the rates did not exceed the value of the service, the company was entitled to a fair return on the value of its property. Then there is a third approach, in which the question is viewed from the standpoint of the State, in which case, factors which from the standpoint of the public or the corporation have varying weights, such as the nature and necessity of the service, the effect of its continuance or withdrawal, both upon the security holders of the corporation, and upon property values, and the welfare of the people in the territory served by it, the extent to which the State itself is a partner in the enterprise, and the circumstances and conditions under which the company acquired and exercises its franchises and privileges, may become of paramount and controlling importance, and in our judgment the question must be approached from that direction.

Before dealing specifically with it, however, we will refer briefly and generally to the powers, functions and duties of the commission, to the extent of its jurisdiction, and to the weight to be given its decisions. That the power committed to the commission is legislative in character, notwithstanding that the manner in which it is exercised is forensic, is no longer open to question (*Gregg v. Pub. Serv. Commn., supra, Chenoweth v. Pub. Serv. Commn., supra*), and, except where limited by the statute itself or some constitutional provision, the acts of the commission, done in the exercise of its statutory powers, are entitled to the same weight which would be given a direct act of the legislature. *Knoxville v. Knoxville Water Co.,* 212 U. S. 8; *Pub. Serv. Commn. v. Byron,* 153 Md. 464.

There has been and is some uncertainty as to the extent to which courts will go in reviewing the conclusions and decisions of such administrative agencies as the appellant. In *Interstate Commerce Commn. v. Union Pac. R. R. Co.*, 222 U. S. 541, in reviewing an order of that commission, it was said:

"There has been no attempt to make an exhaustive statement of the principle involved, but in cases thus far decided, it has been settled that the orders of the commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power, or (3) based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power. * * *

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' *Illinois C. R. Co. v. Interstate Commerce Commission*, 206 U. S. 441. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts

further than to determine whether there was substantial evidence to sustain the order."

While in the later case of the *Ohio Valley Water Co. v. Ben Avon Borough,* 253 U. S. 289, where the Supreme Court of Pennsylvania held that, where there was substantial evidence to support them, the findings of the public service commission would not be reviewed on appeal, the court, in reversing that decision, said: "The order here involved prescribed a complete schedule of maximum future rates and was legislative in character. * * * In all such cases, if the owner claims confiscation of his property will result, the state must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, 14th Amendment. * * *"

The question came before this court and was decided in *Public Serv. Commn. v. Byron, supra,* in accordance with the views expressed in *Interstate Commerce Commn. v. Union Pac. R. R. Co., supra.* In that case, speaking through Judge Parke, it was said: "The first rule is that the order will not be disturbed except upon clear and satisfactory evidence that it is unreasonable or unlawful. This is a legislative mandate which is reinforced by the fact that the commission is a tribunal erected by law, informed by experience, and assisted by a trained corps of subordinates. Code, art. 23, sec. 408; *Public Serv. Commn. v. North. Cent. Ry. Co.,* 122 Md. 355, 388, 391, 392; *Havre de Grace Bridge Co. v. Public Serv. Commn.,* 132 Md. 16, 24; *Interstate Commerce Commn. v. Union Pac. Ry. Co.,* 222 U. S. 541." And that statement of the rule is not only supported by the weight of authority (see discussion in *Dickinson on Administrative Law*), but is required by the statute itself (Code, art. 23, sec. 408), and appears to be indicated by the very nature and necessity of the thing, for reasons pointed out by Judge Parke in *Pub. Serv. Commn. v. Byron, supra.* It is true that in *Ohio Valley Water Co. v. Ben Avon Borough, supra,* the court

said that, where the issue of confiscation was raised, the due process clause of the Fourteenth Amendment required that provision be made for submitting that question to some judicial tribunal authorized to adjudicate it upon its "own independent judgment as to both law and facts"; and that expression is consistent with the theory that in reviewing the decision of an administrative agency the court would review the facts as in an equity case. But such a conclusion is inconsistent with all prior decisions of the Supreme Court, and while in *Bluefields Water Works Co. v. Pub. Serv. Commn.*, 262 U. S. 689, it was again stated that upon the question of confiscation the utility was entitled to the "independent judgment of the court as to both law and facts," it is not thought that, by that language, the court in either of those cases meant to say anything more than that, where the facts are undisputed or must be taken as established, and the inference to be drawn from them inevitable, the courts will review any conclusion of law predicated upon such facts. But we do not believe that it was intended to overturn the policy, established by the decisions of that court and by many state and federal statutes, which commits to such agencies as public service commissions the ascertainment of facts which rest in conflicting evidence, and we find therefore no inconsistency between the language quoted from those opinions and the language of this court in *Public Serv. Commn. v. Byron, supra.* And we feel, too, that in dealing with the constitutional question involved in confiscation some weight must be given to the statute, which places upon the person attacking the decision of the commission the burden of establishing its unlawful or unreasonable character by "clear and satisfactory proof." *Pub. Serv. Commn. v. Byron, supra.*

Reverting now to the main question presented by the appeal, the first inquiry is whether a schedule of rates which permits the appellee to earn 6.26 per cent. on the fair value of its property can be said to be confiscatory within the meaning of that clause of the Fourteenth Amendment of the Federal Constitution, which denies to the states the power of

depriving any person of his property without due process of law. Confiscation, in that sense, is essentially a relative, and not an absolute, term, and it does not exist apart from the facts which are said to occasion it. No fixed or general rule can be announced by which it can be determined whether it exists in any given case, because whether it exists or not must be determined from factors which vary with the facts of each case, since rate cases, like wills, seldom have "twin brothers." *Covington & L. Turnpike Co. v. Sandford,* 164 U. S. 592 *et seq.,* and we know of no authority for the proposition that public utilities, without regard to circumstances or conditions, are entitled to a return of any given amount of percentage on the value of their properties. For while there are cases which hold that such utilities are entitled to a return of six or seven or eight per cent. on the value of their properties, they have no controlling weight, because the decisions are uniformly found to be based upon facts peculiar to the several cases. So in this particular case, in deciding whether the schedule of rates prescribed by the commission is confiscatory, we must be guided by the facts of this case, and are little aided by what this court or some other court may upon different facts have found to be lawful or confiscatory, fair or unreasonable rates.

To attempt to analyze in detail the mass of factual and opinion evidence adduced before the commission is neither practicable or necessary, since such facts as are relevant to the question before us rest for the most part in records of the company or the commission, and are not in dispute, and we will at this time only refer to such as are necessary to indicate the contentions of the parties.

The total value of the company's property, including easements, may be placed at $75,000,000. That was the valuation placed upon it by the commission in 1924, and while there was some dispute as to whether that figure should not be increased to include additions since the valuation, that contention was not stressed in this court, but was treated as a matter of detail which could be adjusted to fit the facts at

some future time, so that the figure of $75,000,000 may be treated as the true value of the company's property for all the purposes of this case.

The financial structure of the company appears from the following tabulation, in which the "basic value" of its property is assumed to be $70,000,000, the value placed upon it by the commission exclusive of the value of the easements, which has been fixed at $5,000,000:

| Class of Securities | Outstanding 12/31/1926 | Per Cent. of Basic Value | Outstanding 6/30/1927 | Per Cent. of Basic Value |
|---|---|---|---|---|
| Mortgage Bonds. | $47,405,000 | 67.7 | $47,405,000 | 67.7 |
| Miscellaneous Obligations.. | 6,392,700 | 9.1 | 7,664,200 | 10.9 |
| Income Bonds.. | 13,977,000 | 20.0 | 13,977,000 | 20.0 |
| Total Bonds and Miscellaneous Obligations.. | 67,774,700 | 96.7 | 69,046,200 | 98.7 |
| Stocks......... | 20,461,200 | 29.2 | 20,461,200 | 29.2 |
| Grand Total.. | $88,235,900 | 126.0 | $89,508,400 | 127.9 |

And it appears that the company has for some time past been paying, and still pays, dividends on its common stock at the rate of four per cent., and that that stock, having a par value of fifty dollars per share, has in late years sold on the Baltimore Stock Exchange at prices ranging from sixteen dollars to twenty-one dollars per share, and it further appears that its mortgage bonds bought at current market prices yield the purchaser a return of about six per cent. From time to time, since 1911, the company has had occasion to borrow for varying periods, and the rates at which this money was bought, as shown by the following tabulation, throws some light upon the changes in its credit:

| Issued | Description | Amount | Proceeds | Rate Received | Interest Rate |
|---|---|---|---|---|---|
| 1911, 2nd Half. | 3-Year Notes... | $3,125,000 | $3,046,876 | 97½ | 5% |
| 1914, 2nd Half. | 10-Year Car Trust Certificate... | 153,000 | 153,000 | 100 | 6% |
| 1914, 2nd Half. | 2-Year 5% Collateral Trust Notes... | 1,000,000 | 995,000 | 99½ | 5% |
| 1914, 2nd Half. | 1st Mtge. Gold Sinking Fund Bonds (Md. Elec. Rys.)... | 489,000 | 469,440 | 96 | 5% |
| 1916, Feb. | ...5-Year 5% Gold Notes... | 2,750,000 | 2,695,000 | 98 | 5% |
| 1917, Oct. | ...6% Convertible Gold Notes... | 3,000,000 | 2,850,000 | 95 | 6% |
| 1919 | ...5-Year Convertible Notes... | 1,528,000 | * | * | 5% |
| 1917 | ...1st Mtge. Gold Bonds (Md. Elec. Rys.)... | 457,000 | 447,860 | 98 | 5% |
| 1920, 2nd Half. | Car Trust Certificates—Series 1920 (10 Yrs.)... | 875,000 | 831,250 | 95 | 8% |
| 1921, Feb. | ...7½% Coupons Gold Notes... | 1,500,000 | 1,383,750 | 92¼ | 7½% |
| 1922, Apr. | ...1st Consol. Mort. 50-Year Gold Bonds... | 6,000,000 | 5,550,000 | 92½ | 6% |
| 1922 | ...1st Consol. Mort. 50-Year 6% Gold Bonds... | 6,000,000 | 5,500,000 | 92½ | 6% |
|  | In lieu of 4% Bonds ($2,684,000 at $250 per Bond... | | 671,000 | | |
| 1922, July | ...5-Year 6% Gold Notes... | 2,500,000 | 2,375,000 | 95 | 6% |
| 1924, 1st Half. | 1st and Refunding Gold Bonds, Ser. A. (Md. Elec. Rys.)... | 4,000,000 | 3,790,000 | 94¾ | 6½% |
| 1927, July | ...3-Year Notes... | 2,500,000 | 2,412,000 | 96½ | 6% |

From another table, filed by people's counsel, it appears that the net income of the company, for the years from 1920 to 1926, inclusive, was as follows: 1920, $1,043,599.21; 1921, $735,230.58; 1922, $799,268.99; 1923, $976,266.38; 1924, $976,068.39; 1925, $980,609.53; 1926, $1,010,-054.41; and that for the same period the operating income was: 1920, $17,313,589.84; 1921, $16,332,865.34; 1922, $16,122,592.02; 1923, $16,461,798.86; 1924, $16,453,-254.31; 1925, $16,621,220.20; 1926, $16,715,709.07.

Another tabulation filed on behalf of the people indicated the following ratio of funded debt to track operation per mile, and gross revenue per dollar in a number of American cities:

|  | Funded Debt and Income Bonds | Funded Debt per Mile of Track Operation | Funded Debt per Dollar Gross Revenue |
|---|---|---|---|
| Baltimore. . . . . . . | $67,774,700 | $164,000 | 4.05 |
| Without Income Bonds. . . . . . . | 53,797,700 | 130,000 | 3.22 |
| Detroit. . . . . . . . . . | 35,155,000 | 88,000 | 1.63 |
| Los Angeles . . . . . | 19,852,000 | . . . . . . | 1.64 |
| San Francisco . . . | 11,695,000 | 42,600 | 1.19 |
| Pittsburg. . . . . . . . | 34,215,000 | 57,700 | 1.57 |
| Boston. . . . . . . . . . | 49,819,000 | 100,200 | 1.41 |
| Cleveland. . . . . . . | 5,495,000 | 13,310 | .30 |
| St. Louis . . . . . . . . | 52,590,000 | 120,900 | 2.80 |
| St. Paul, Minn. . . | 19,478,000 | 38,700 | 1.40 |
| Buffalo. . . . . . . . . . | 25,392,782 | 62,200 | 2.47 |
| Providence. . . . . . | 13,714,000 | 47,200 | 1.61 |
| Washington. . . . . | 5,606,000 | 77,000 | 1.21 |
| Cincinnati. . . . . . | 5,288,400 | 19,840 | .65 |
| Indianapolis. . . . . | 13,497,517 | 56,300 | 2.35 |
| Denver. . . . . . . . . | 10,863,500 | 48,900 | 2.38 |

Still another table showed the current rates of fare, rate of return, and base, in twelve representative American cities comparable in size to Baltimore, to be as follows:

| | Rate of Return | Base | Fare |
|---|---|---|---|
| Baltimore (New Fare).. | 6.26 | $75,000,000 | 9c— 3 for 25c |
| Boston................ | 4.64 | 159,025,142 | 10c— 4 for 25c (limited) |
| Chicago Surface Lines.. | 6.27 | 164,600,000 | 7c— 3 for 20c |
| Cincinnati........... | 4.16 | 36,381,017 | 10c— 3 for 25c |
| Cleveland............ | 4.35 | 37,106,506 | 7c— 8 for 50c |
| Kansas City.......... | 1.82 | 23,300,000 | 8c—15 for $1.00 |
| Los Angeles.......... | 3.06 | 54,000,000 | 5c |
| Philadelphia......... | 5.07 | 216,000,000 | 8c— 2 for 15c |
| Pittsburg............ | 5.85 | 68,170,000 | 10c— 3 for 25c |
| St. Louis ............ | 4.66 | 52,024,192 | 8c— 2 for 15c |
| San Francisco ........ | 5.37 | 35,000,000 | 5c |
| Washington.......... | 4.69 | 50,000,000 | 8c— 6 for 40c |

And another table lists seventy-nine American cities, each having a population of over 100,000, and shows the population of each city, the rate of fare charged on the street railways, and commutation privileges, established in connection with such fares in each city. In analyzing that table Mr. H. Carl Wolf, engineer for the commission, testified:

"Of the 81 cities listed as having a population of 100,000 or more, only nineteen of them have a fare higher than Baltimore. There are thirty cities with a ten cent fare. Only one of these has a straight ten cent fare with no tokens. Ten of them, or one-third the number, have an eight and one-third cent token fare, six of them have an eight and one-third cent token fare, plus a pass system, one of them has a seven and a half cent token fare, plus a pass system, and when the commission recalls that at the present time ninety-seven per cent. of the full fare passengers in Baltimore are using the token fare, they will see that the ten cent—seven and a half cent fare, plus a weekly pass, if applied to Baltimore, would cause practically no increase in fare, and probably a decrease.

There is one of these thirty cities with a ten cent fare which has not a token fare but which does have a pass, and eleven of them with ten cent fares charge seven and one-half cents or lower for tokens with no passes."

And in criticising that analysis Mr. C. D. Emmons, president of the company, said:

"I have this from the late bulletin: that the trend of fares over the United States has been upward since July 1st, 1923, and is continuing upward. On October 1st, 1927, the average fare of 272 cities reporting was 7.9516 cents and November 1st, 1927, the average fare was 7.9846 cents, which is the highest average fare that the street railway industry has ever had, not excluding the war period.

"There are at the present time, or since the November bulletin, there have been twelve different cities that have changed the rate of fare. There are three interurban roads that have changed the rate of fare. At the present time there are fourteen fare cases pending.

"Q. What are the direction of those changes? A. The changes are all up with the exception of a municipal city which has put in a weekly pass, and the information here does not say about the flat fare. I presume it's the same, a flat fare with a weekly pass. I think they give a statement that there are only, I have forgotten, of basic ten cent fare cities, but my statement here is that there are—I got this morning, dated November 26th, from New York—this gives 219 United States cities. Q. Having a basic fare of ten cent? A. That's right, yes. (Mr. Tingley): Those are not cities of over 100,000? (The Witness): No; but I counted the cities of over 100,000 in this and there are thirty-one cities of over 100,000 that have a basic ten cent fare. * * * (The Witness): Cicero, Illinois, 65,400; Forest Park, Illinois, 10,768; Maywood, Illinois, 12,072; Oak Park, Illinois, 53,500; Auburn, Maine, 16,985; Bangor, Maine, 25,978; Bath, Maine, 14,731; Lewiston, Maine, 35,500; Villercia, Massachusetts, 3,646; Boston, Massachusetts, 787,000; Braintree, Massachusetts, 10,580; Concord, Massachusetts, 6,461; Framingham, Massachusetts, 17,033; Holyoke, Massachusetts, 60,400; Lexington, Massachusetts, 6,350; Natick, Massachusetts, 10,907; Needham, Massachusetts, 7,012; Newburyport, Massachusetts, 15,618; Newtonville, Massa-

chusetts, 5,700; Wakefield, Massachusetts, 13,025; Waltham, Massachusetts, 35,700; Wellesly, Massachusetts, 6,224; Woburn, Massachusetts, 16,574; Worcester, Massachusetts, 193,300; Morristown, New Jersey, 12,548; Ocean City, New Jersey, 3,721; Lackawanna, New York, 17,918; Mauchnuck, Pennsylvania, 3,666; West Chester, Pennsylvania, 11,717. * * * (Mr. Clark): How many states now have you cited there? (The Witness): Six states."

From other tables it appears that the wages of "platform" men have increased from a maximum of twenty-two cents an hour in 1913 to a maximum of fifty-three cents an hour in 1926, that other wages showed an approximately similar increase, and that during the same period the general cost of living showed an increase from a base index of 100 to an index of 173.

Perhaps the most significant fact connected with the question before us is the decline in the number of revenue passengers carried by the company, from 253,834,179 in 1919, to 225,225,633 in 1926, and 145,256,760 (August approximated) for eight months of 1927. Coincident with that decline was a gradual increase in the rates of fare from five cents prior to 1919 to seven and one-half cents in 1927, and an increase in the registration of automobiles from 85,430 in 1919 to 267,649 in 1926.

In connection with those figures a further fact appears, which is that, while the total number of revenue passengers is decreasing, the peak load of passengers, that is, the greatest number of passengers carried during the "rush hours" each day, has increased, and, to accommodate that increasing demand, it has become necessary for the company to maintain an increased equipment, which is to some degree idle during a part of the day.

One of the contentions made by the company was that the existing rates so affect its credit that it is compelled to pay unreasonably high rates for money, and in connection with that contention it filed a table showing the rates it has paid since 1920, which in part shows:

| Date of Issue | Amount of Issue | Less Banker's Commission | Cost of Money to Company | Market Price |
|---|---|---|---|---|
| July 1, 1920—Car Trust 8% Gold Certificates.... | $875,000 | $43,750 | 9.3⁄8% | 100 |
| Jan. 15, 1921—Ten Year 7½% Gold Notes....... | 1,500,000 | 90,000 | 8.70% | 98¼ |
| Mar. 1, 1922—First Consolidated Mortgage 6's, due March 1, 1949...... | 6,000,000 | 270,000 | 6.75% | 97 |
| Mar. 1, 1922—Deposit of $250 per $1,000 bond by holders of $2,684,000, first consolidated mortgage 4's to secure additional 2% interest coupons.............. | 671,000 | 28,903 | 6.60% | .. |
| Aug. 1, 1922—Five Year 6% Gold Notes........ | 2,500,000 | 75,000 | 7.27% | 98 |
| Jan. 1, 1928—Maryland Electric Rwys. Co. First and Refunding Mortgage Gold Bonds, Series "A"-6½%, due Jan. 1, 1957........... | 4,000,000 | 210,000 | 6.93% | 100 |
| Mar. 1, 1927—Three year 6% Gold Notes......... | 2,500,000 | 62,500 | 7.32% | 99¼ |

These facts are but a small part of those to be found in the mass of evidence contained in the record, but they are sufficient to indicate the grounds for the conflicting contentions of the parties to this appeal, which, as we understand them, are in substance as follows:

In respect to the main question, the appellant appears to contend that the schedule of fares promulgated by the commission is, under existing conditions, all that the service is worth, and fair alike to the company and the public, but that, whether fair to the company or not, no higher rates should be allowed, because the company is only entitled to collect from the public the value of the service it renders.

The contention of the company, on the other hand, seems to be that it is entitled to earn a fair return on the value of

its property, that "fair return" means a return of at least eight per cent. on the value thereof, and that it is entitled to a schedule of rates high enough to insure that return regardless of the value of its service to the public. Or reduced to its lowest terms, and quoting its own language, the company's proposition is that "compulsory limitation of the company's rates to yield a maximum of less than eight per cent. is confiscatory and unlawful," while the commission contends that "rates must in no event exceed the value of the service, regardless of return or confiscation"; and somewhere between those extreme theories lies the law.

Manifestly the proposition submitted by the company is broader than the law, while that of the commission is too indefinite and vague to be of much aid in settling the question before us. There is, so far as we know, no rule of law which guarantees to public service corporations the right to earn eight per cent. on the value of their properties, regardless of the fairness of their rates to the public or of any other fact or circumstance, but the law, as stated in *Covington & L. Turnpike Co. v. Sandford, supra,* is to the contrary There it is said (page 596) : "It is proper to say that if the answer had not alleged, in substance, that the tolls prescribed by the act of 1890 were wholly inadequate for keeping the road in proper repair and for earning dividends, we could not say that the act was unconstitutional merely because the company (as was alleged and as the demurrer admitted) could not earn more than four per cent. upon its capital stock. It cannot be said that a corporation operating a public highway is entitled, as of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is

reasonable and just for the public. If the establishing of new lines of transportation should cause a diminution in the number of those who need to use a turnpike road, and, consequently, a diminution in the tolls collected, that is not, in itself, a sufficient reason why the corporation, operating the road, should be allowed to maintain rates that would be unjust to those who must or do use the property. The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends." Nor is there any rule by which we may precisely determine what is the actual value to the public of such service as that which the company sells.

When the company speaks of a "return of not less than eight per cent." on its property, it must be remembered that nearly $68,000,000 of its actual value is covered by bonded indebtedness or other obligations bearing a fixed rate of interest far below that rate, and that the balance of the eight per cent. return remaining after paying that interest would go to the holders of stock having a par value of $20,461,200, the real value of which is $7,000,000, if the easements are valued at $5,000,000, or $2,000,000, if they are excluded, which would necessarily be greater than an eight per cent. return on the value of that stock. But aside from that, and assuming that the rate schedule will yield less than eight per cent. on the actual value of all the company's property, or even less than eight per cent. on the actual value of the stock, that fact alone cannot characterize it as confiscatory, but other factors must be considered.

It is argued that an eight per cent. return is necessary to enable the company to borrow money at reasonable rates, and that the fact that it is limited to a rate schedule which will yield a return of only 6.26 per cent. puts it at a disadvantage as a borrower and weakens its credit. But the evidence fails to support that contention. It is true that there is in the record a mass of subjective and highly conjectural testimony *pro* and *con* relating to it, much of which tends to support the company's contention, but, whilst its usefulness may be conceded, the speculative opinions of ex-

perts who are themselves interested in increasing the rate of return on similar utilities cannot be substituted for the judgment of the commission, and accepted as a conclusive determination of the question, at least where the judgment of the commission is based upon substantive evidence.

The value of such securities as the obligations of public utility companies depends in the main upon the security they offer, as well as the rate of return which they will pay the investor. And it is quite as reasonable to assume that the fact that the ratio of the company's funded debt to the value of its property is, as the commission found, approximately ninety per cent., affects its credit, as the fact that it can only earn 6.26 on the value of its property.

In connection with that contention, the company asserts that the use of the automobile for the transportation of those who otherwise would use its lines has increased to such extent that it has reduced its net revenue to such a point, that any rate schedule indicating a return of less than eight per cent. on the value of its property impairs the security offered investors, and lessens the confidence of the public in its financial stability, and that therefore it is entitled as of right to a schedule which will insure such a rate of return regardless of its effect on that part of the public who for one reason or other are obliged to use its lines. But if, as the company contends, it is required to pay more for its money because of the risk resulting from the increasing competition of the private automobile, it certainly cannot expect to correct that condition by raising its rates to such a point that investors will purchase its stock as a gambling or speculative venture. Nor in fact do we see any occasion for the gloomy outlook of the company's witnesses. It appears to be well and economically managed, and the market price of its securities indicates continued public confidence in its stability, as well as in its ability to liquidate its obligations, when and as they accrue, and from the volume of its business there is little likelihood that it will cease to be a highly productive property, not only useful but essential to the city's welfare and the public convenience, and profitable to its owners, provided

sufficient allowance is made for keeping its property from depreciating..

There seems to be no question but that the private automobile is a serious competitor of the company, and it is estimated that it carries about twenty-five per cent. of those who would but for it use the street cars, and it is possible that it may make further inroads on its business, regardless of rates. In fact, the company rather repudiates the idea that rates have any substantial effect upon the volume of its traffic, but attributes its decline almost entirely to the automobile, although as a matter of common sense there must be some substantial relation between transportation rates and the volume of traffic. But, irrespective of that, the company's contention ignores one very important if not controlling consideration, and that is that it is a "public" service company, and that practically speaking the substantial value of all of its property is due primarily to franchises and privileges which it has secured from the state, upon the condition, express or implied, but always present, that it will give in return adequate service at reasonable rates. Those privileges include not only the right to do business and operate its lines over public highways, but also protection against any other agency offering to perform the same service in the same territory. So that when the company contends that since conditions, which neither it nor any one else can control, increase the expense of its service, that it should be permitted not only to transfer that entire burden to that part of the public who must of necessity use its lines, but to also increase its net earnings beyond a point they have ever reached, it ignores the very patent fact that if the State withdrew from it the protection from competition by other public service companies offering the same service which it now enjoys, its very existence would be threatened. The mere fact therefore that increasing automobile competition has made it more expensive for the company to serve those who do use its lines, while it justifies increasing its rates to a point which will absorb the increased expense, affords no excuse for still further increasing them to a point which will not only be burdensome to the

traveling public, but will at the same time yield to the company a greater return than it has ever received, and greater than that usually received by others operating in the same field elsewhere under substantially the same conditions.

Whether a given rate is burdensome to the public, involves the question of the value of the service, and presents an extremely difficult and troublesome question, the answer to which, except in extreme cases, can only rest in the judgment of the commission, operating upon varying factors, each of which is entitled to some weight, but no one of which ordinarily is controlling.

One consideration suggested is the diminished purchasing value of the dollar, the increase in wages, and the fact that wages have risen higher than the cost of living, on the theory that, as the public has more money to spend, it suffers no hardship if it is required to spend more, and that by judicious management it may for that reason be brought from a five cent to a ten cent state of mind without any serious physical or mental disturbance or inconvenience. But while that theory may have a certain appeal for the company, it is too refined and delicate for general and practical use, and although it might have a material and substantial relation to the operating expenses of the company, it has no apparent relation to the value of its service. The fact that it cost one man three dollars to grow a bushel of wheat is no reason why a purchaser should be compelled to pay him three dollars for it, if in fact, measured by the market, it is only worth two, and ordinarily the affluence of the buyer has no perceptible relation to the value of the product of the seller. Whilst not strictly analogous, recent developments in the ice business tend to illustrate the fallacy of that contention. It is a matter of general knowledge that the manufacture and sale of machines for artificial refrigeration, and the manufacture of ice in homes, has had a serious effect on the artificial and natural ice business as formerly conducted. But assuming that the ice business is a public utility and its rates subject to regulation, it would be manifestly unreasonable to allow an ice company to charge to its patrons the losses it

had suffered from the inroads of competitors, by requiring them to pay rates high enough to absorb these losses.

Another factor suggested is that a decrease in the volume of traffic indicates that the rates are burdensome, and there is some force in that suggestion, but the difficulty in this case lies in attributing the decline to the increase of fares. So far as the facts go, it may be due either to that or to the increasing use of the automobile. Whether it is due to one or the other is a matter of unguided conjecture. For while there is in the record a confused mass of contradictory figures relating to the effect of increased rates on the volume of traffic, it is impossible to deduce from them any definite or sound conclusion.

Nor can the value be determined by comparison, by the market, or by what it would cost an individual to obtain by a privately owned agency the same service. There is no other public agency rendering the same service with which the company can be compared, for it is protected in a monopoly, and for the same reason there is no general market by which the value of its service can be ascertained, nor would it be reasonable to measure its value by what it costs the owner of an automobile to operate it so as to give like service, because of the difference in machines and in the expense incident to their operation, and because there is no fair comparison between the operation of a private automobile and a public service corporation operated as a monopoly and for profit. So that, in determining whether the rates fixed by the commission are confiscatory, we are finally remitted to a few simple realities, such as the past earnings of the company, the returns usually received by other companies engaged in the same business in other fields under somewhat similar conditions, the rates which the company has voluntarily fixed for its service in the past, the decrease in the purchasing power of the dollar, and the effect which other orders of the commission have had upon the earning power of the company.

It may be assumed that the base fare prior to the formation of the commission was reasonable, because up to that time no complaint had been made of it by the company, and

in 1900 it was fixed by an act of the Legislature, which has never been challenged. The fare then was five cents, which would be approximately equal to eight and one-third cents today, when the decreased purchasing value of the dollar is considered, and, if that were all, the question would be free from difficulty, for if five cents was fair, then the equivalent of the value which five cents had then should be fair now. But there are other factors which affect it, such as the extension of the city fare zone, so as to embrace all the new territory brought into the city by the annexation of 1918, the effect of which was to relieve a part of the public of the burden of an extra fare, possibly at the expense of the company, and certainly of the remaining part of the public, and also the fact that certain of the operating expenses of the company, such as the cost of labor, increased in a ratio greater than that in which the purchasing power of the dollar declined, for, although speaking generally the dollar now will purchase perhaps sixty per cent. of what it would in 1913, it will not purchase as much as fifty per cent. of the labor which the company could have bought with it then.

But these factors were considered fully by the commission when it fixed the base fare at seven and one-half cents in 1924, and in view of that finding, and of the further fact that the record does not disclose any data sufficiently specific to enable us to say that it was unlawful, we are not inclined to give them any controlling weight now, especially as the schedule fixed by the order in this case is designed to give the company a higher return on its property than it received prior to the extensions.

It also appears that, if the schedule produces the results anticipated by the commission, that the net earnings of the company in comparison with the value of its property will be as great as, if not greater than, at any time in so much of its history as has been called to our attention, and that it will yield a return thereon, with one possible exception, higher than that now received by any company engaged in the same business under conditions at all comparable to those obtaining in Baltimore and its environs, and higher than the inter-

est rate allowed by statute in this state. Code, art. 49, sec. 1. After giving due consideration to these several factors, and to Code, art. 23, sec. 408, we are unable to say that the schedule of fares promulgated by the order appealed from was unlawful, unreasonable, or confiscatory, which permits a return of 6.26 on the value of the company's property, and it follows that so much of the opinion of the trial court as set aside that part of the order and enjoined its enforcement was in error. And that conclusion seems to be in accord with such authority as there is on the subject. In the case of *Smyth v. Ames,* 169 U. S. 545, the court expressly reaffirmed and approved the statement in *Covington & L. Turnpike Co., supra,* to which we have referred. *McCardle v. Ind. Water Co.,* 272 U. S. 419, cited by appellee, can scarcely be considered authority to the contrary. For, aside from the fact that the decision in that case was based upon facts essentially different from those in this case, it merely held upon those facts that at that time a rate of seven per cent. was not confiscatory. In respect to that question it said: "The evidence is more than sufficient to sustain the rate of seven per cent. found by the commission." And while there is a certain ambiguity inherent in that expression, it certainly did not establish the rule that anything less than seven per cent. would in all cases have been confiscatory, and that is the interpretation placed upon it in the dissenting opinion of Mr. Justice Brandeis, where it is said: "To avoid the possibility of misunderstanding, I add merely that in my opinion the facts of record, considered in connection with those of which we have judicial notice, do not justify holding that rates which yield a return of less than seven per cent. would be so unreasonably low as to be confiscatory." Nor is the case of *Railroad and Warehouse Commn. v. Duluth Street Rwy. Co.,* 273 U. S. 625, in point. There the commission allowed a charge of six cents, but required the company to issue six tickets for not less than twenty-five cents. The district court prohibited the enforcement of that rate, and authorized the carrier to charge not more than six cents flat. On an appeal the Supreme Court only considered the question of whether

the district court had jurisdiction to hear the complaint, and the question of the reasonableness of the rates was not referred to.

There is certainly nothing in these cases, nor in any other decision of the Supreme Court, which is the final authority upon the question involved in this appeal, which is in any way inconsistent with the decision of that court in *Dayton-Goose Creek R. R. Co. v. United States,* 263 U. S. 456, 481, in which the court through the chief justice in part said: "The carrier owning and operating a railroad, however strong financially, however economical in its facilities, or favorably situated as to traffic, is not entitled, as of constitutional right, to more than a fair net operating income upon the value of its properties which are being devoted to transportation. By investment in a business dedicated to the public service the owner must recognize that, as compared with investment in private business, he cannot expect either high or speculative dividends, but that his obligation limits him to only fair or reasonable profit. * * * The act fixes the fair return for the years here involved, 1920 and 1921, at five and a half per cent., and the commission exercises its discretion to add one-half a per cent. The case of *Bluefield Waterworks and Improvement Co. v. Public Serv. Commn.,* 262 U. S. 679, is cited to show that a return of six per cent. on the property of a public utility is confiscatory. But six per cent. was not found confiscatory in *Wilcox v. Consolidated Gas Co.,* 212 U. S. 19, 48, 50; in *Cedar Rapids Gas Light Co. v. Cedar Rapids,* 223 U. S. 655, 670; or in *Des Moines Gas Co. v. Des Moines,* 238 U. S. 153, 172. Thus the question of the minimum of a fair percentage on value is shown to vary with the circumstances." That statement has never been modified or overruled, and so far as we are advised is still the law.

### DEPRECIATION.

Assuming that a schedule of fares which will yield to the company a return of 6.26 per cent. on the value of its property is neither confiscatory nor unreasonable as a matter of law, the next question is whether the schedule adopted by

the commission in this case will in fact yield such a return. The answer to that question necessarily involves the allowance made for the depreciation of the company's property used in the service to which it is dedicated. It is an elementary principle, not only of constitutional law, but of common right, that such a company must be permitted to earn such an income as will not only yield a fair return on the fair value of its property, but which will be sufficient to enable it to keep its property at a constant level of efficiency, so that it will be adequate for the public needs, and so that the value upon which the return is based will not be lessened. Anything more than that would be unjust to the public, anything less than that would be unjust both to the public and to the company. For the public should not be required to pay rates based upon the present value of the property if that value is to be permitted to steadily depreciate, nor should the company's property be consumed in the public service without adequate provision for restoring to it the equivalent of its value. So that the company is entitled to such an allowance as will not only adequately provide for current repairs, but for depreciation due to necessary retirements, obsolescence, and the diminishing utility of property which cannot be arrested by repairs. So much is self-evident, is conceded by the parties to this appeal, and does not appear to be questioned anywhere. *Knoxville v. Knoxville Water Co.,* 212 U. S. 1, Rose's Notes.

The allowance made for current repairs under the head of maintenance does not appear to be questioned, so that the only inquiry is whether the allowance for depreciation is adequate. The commission, in fixing the fare schedule, allowed five per cent. on the gross revenue of the company for depreciation, and estimated that that allowance would yield $883,544 in 1928, allowing for a decrease in the volume of traffic, and its opinion indicates that in reaching that conclusion it considered the cost, and not the present value, of the company's depreciable property. Unquestionably there is authority for that method of calculating a proper depreciation reserve, but in our opinion it is artifi

cial, illogical, and unsound, and ought not to be approved, and, since we cannot say that proper methods would not have produced a result which would have affected the rate schedule adopted, the case should be remanded to the commission, in order that it may consider and determine the proper allow-ance for depreciation in accordance with rules hereinafter stated, and if necessary readjust the rate schedule to cover any changes it may make in that allowance.

The allowance of a given percentage on the gross income of the company as a method for computing depreciation is said to be justified by accounting usages, but in such a case as this we are not dealing with bookkeeping customs, but with sub-stantive rights protected by constitutional guaranties, and there seems to be no logical reason why the depreciation should not be based upon the actual value of the property it-self, rather than upon vague and conjectural inferences drawn from the money the property earns. The accuracy of such a method must be largely subjective, since there is no appar-ent connection or relation between the income which property yields and the depreciation resulting from its use in earn-ing that income. It is true that it is said to have been tested by more direct and intelligible methods, but, if that is so, such methods should have been used in the first place, and not as mere checks upon a method not justified either by law or logic. But even so, if the conclusion actually reached was proper, the fact that it was reached by improper methods would not justify us in disturbing it, so that the more impor-tant question is whether the base of the calculations by which it was tested was itself lawful. And that depends upon whether the commission should have based its allowance for depreciation upon the original cost of the property, or upon its present value. It actually did use cost and not present value as the basis of its conclusion, and here again it must be said that there is authority for its procedure. But in our opinion it is justified by neither law nor right reason.

In valuing the property for rate making purposes, the commission based its conclusion upon its present value and not upon its original cost, and in fact the case of *Havre de*

*Grace Bridge Co. v. Pub. Serv. Commn., supra,* left it no alternative. But if it was essential to adopt that method for ascertaining the value of the property to which the rates were applied, it is not easy to see why it should not be adopted in estimating the amount needed to replace that property when it is worn out or becomes obsolete and worthless. If the company paid $100,000 for property now only worth $10,000, it would be grossly unfair to the public to base its annual depreciation on its cost, and if on the other hand the company paid $10,000 for property now worth $100,000, it would be equally unfair to it to compel it to sell that property to the public at ten per cent. of its real value. These conclusions seem to be self evident, and, while there is authority to the contrary, they are supported by the reasoning in such cases as the *Havre de Grace Bridge Co. v. Pub. Serv. Commn., supra; Knoxville v. Knoxville Water Co., supra,* and *Michigan Pub. Util. Commn. v. Mich. St. Tel. Co.,* 228 Mich. 658, and from the standpoint of fair play both to the company and the public are inevitable. To require the company to sell its service at rates which made no provision at all for the replacement or repair of the property when worn out or obsolete, would be plain confiscation, and to require it to sell it at rates which make an inadequate provision for the return of its value when worn out or obsolete as a result of public service can be no less.

Counsel for the commission suggest that to restore value would be to "require the financing of additions to plant, to the extent of the excess of replacement over original cost of property replaced, by the public, which would in turn have to pay a return on the capital thus required." The meaning of that suggestion is not altogether clear, but if it is that the company is entitled to the return of anything less than the value of its property, it cannot be sustained. Money deducted from earnings to replace equipment, which has become worn out or obsolete, by other equipment of the same character and the same value, adds nothing to the company's resources but merely keeps them at the same level.

In testing the result arrived at by allowing a depreciation reserve of five per cent. on the gross income of the company, the commission appears to have been largely influenced by the history of the company during the last few years. That is, it 'appears to have concluded that, since the company had not actually expended its entire depreciation reserve in replacement, that it must have been sufficient. But that does not follow. The mere fact that it did not spend its entire reserve on replacements is not conclusive evidence that replacements which were not made were not needed. For the company may have been influenced by such considerations as the condition of the money and supply markets, whether the replacements should be postponed to harmonize with contemplated changes in equipment, or whether the maintenance of a substantial reserve was necessary to financial stability, and we do not regard that as an adequate test. But in our opinion there should have been some physical inspection of the property and investigation of the probable useful life of the property, as shown by the experience of this company and other companies using similar property in the same way, and an estimate made based in part at least upon such an investigation of the probable annual depreciation. The commission suggests that such a test could only be properly applied to accrued depreciation, but we see no force in that argument. If an inspection of equipment shows it to be in a fair condition of repair, and experience and judgment indicate that with reasonable care it should last for a reasonably certain time before becoming worthless, that would certainly seem to be a more reliable guide in determining its annual depreciation than the amount of money it earned, or the fact that, when similar equipment became worthless, the company did not see fit to replace it.

The company also takes sharp issue with the commission on its policy in respect to obsolescence as an element of depreciation. It is difficult, because of the method of calculation adopted, to determine to what extent the commission did consider that question, except that it is clear that it did

not allow for extraordinary obsolescence, and in that conclusion we are in complete accord. But ordinary obsolescence is a tangible and concrete thing, for which some allowance should be made in any estimate of depreciation in such property as that operated by the company. Experience infallibly indicates that, as a result of social or economic changes, or the progress of science and the improvement of mechanical and electrical equipment, some part of the company's property will from time to time become out of date, and unsuited to its present needs, and should be retired. Such obsolescence is really depreciation, and should be considered in any fair or reasonable estimate of the probable annual depreciation of the company's property. Extraordinary obsolescence, however, is quite another thing, and by extraordinary obsolescence we mean an extensive supersession of property used for the transmission or the generation of power, or instrumentalities used for the transportation of passengers. Such obsolescence has seldom occurred in the past and whether it will occur in the future at all, or, if it does, when it will occur, and how extensive it will be, are all matters of unrestrained speculation and conjecture, and we know of no theory upon which any depreciation allowance could be made to cover it. If it ever does occur, it can be considered by the commission in the light of actual facts, and such allowance and adjustments made as may be proper under the circumstances, but until it does occur it is entirely irrelevant to any consideration of the proper allowance to be made to cover the anticipated annual depreciation in the company's property.

The last question raised by the appeal is whether the action of the commission in abolishing the second fare zone on the Halethorpe line was unlawful, or unreasonable. In objecting to that action the company has used the term "confiscation" with considerable freedom and some looseness. If, as we have held, rates yielding a return of 6.26 are not confiscatory in law, then it is difficult to see how extending the city fare zone to include Halethorpe is confiscatory, for

any loss occasioned by the extension is absorbed by the increased fares and does not in theory affect the rate of return, and if in fact it does affect that rate, such adjustment may be made by the commission as actual experience shows to be necessary to enable the company to earn a fair return on its whole property. Naturally some parts of the company's system are more profitable than others, but that does not make it necessary to establish different fares for the different lines, varying in amount with the prosperity of the several lines. Some reliance was placed upon a supposed "city line standard," but the city line is a mere arbitrary invisible line of separation between political units, and the "standard" was established apparently with the consent of the company, that there might be a single fare within the city limits, and has certainly been disregarded in at least several instances. The extension to Halethorpe is not profitable, was built at a loss at the request of the inhabitants of the territory served by it, and, it is intimated, upon their assurance that they would not ask that it be included in the city fare zone. It is nevertheless a part of the entire system, and the rates charged on it should be measured to some extent at least by the standards applied to other parts of the system.

The commission found as a matter of fact that "the total distance from the center of the city that may be traveled on the Halethorpe line is a fraction more than five miles, while the single fare zones on nine other lines extending into the suburbs are longer than the two zones to Halethorpe. As pointed out by counsel, the first fare zones of six of these nine lines extend a substantial distance beyond the Baltimore City limits. Five of them have no second fare zones whatever." That finding was based upon undisputed evidence, and in our judgment afforded a substantial basis for the action of the commission in including the entire Halethorpe line within a single fare zone, and we cannot say that it was either unlawful or unreasonable, and we will not therefore disturb that part of its order which deals with that question. *North. Cent. Rwy. Co. v. Pub. Serv. Commn.*, 122 Md. 255.

For reasons already stated, it follows that so much of the decree from which this appeal was taken as vacates that part of the order of the commission which fixes the schedule of fares to be charged by the company, and so much of said decree as enjoins the enforcement of that part of said order, was erroneous, but because that schedule was in part based upon an allowance for annual depreciation arrived at by unlawful and unreasonable methods and by the use of an unlawful and unreasonable basis, that part of the decree will neither be affirmed nor reversed, but the case will be remanded, in order that the commission may further consider the question of depreciation, and make any changes in the rate schedule which may be necessary and requisite to yield to the company a fair and reasonable return upon the fair value of its property. And so much of the decree as affirms that part of the order which extends the first fare zone of the Halethorpe line to the terminus thereof will be affirmed.

> *Decree affirmed in part and reversed in part and case remanded for further proceedings in accordance with the views expressed in this opinion, each party to pay one-half the costs.*

ADKINS, J., filed a concurring opinion as follows:

It will probably be thought a work of supererogation for one, who agrees with the conclusions reached in the able opinion written by Judge Offutt for the court, to file a concurring opinion. When the opinion is read as a whole there should be no misconception as to its meaning, so far as any expressions therein are necessary to the conclusions. But it is always possible, in reading detached expressions and considering them out of their setting, to attribute to them a bearing not intended by the writer or by the court. For that reason, and to make my own position clear, I file this memorandum, in which I desire to state what I understand

to be the meaning of Judge Offutt and of the court as to the matters herein referred to.

It was not intended, as I understand, to suggest that there is anything in the record to indicate that a ten cent fare would be more than the service is worth, if such a fare should be found necessary to pay for the cost of the service and to give the company a fair return on the value of its property. Nor, as I understand, was it intended to indicate that a finding of the commission as to the proper amount to be allowed annually for accruing depreciation would be conclusive and unreviewable, even though the commission should base that finding on present value rather than original cost, if *the amount* so found should be manifestly unreasonable on the whole evidence. Here, the question of confiscation is involved; and in any hearing by a court on such a question it must be satisfied, not necessarily that it would have reached the same conclusion on the evidence, but, at least, that the conclusion reached by the commission was fairly deducible from the evidence. The opinion clearly indicates the kind of evidence on which a finding as to depreciation should be based.

There are some expressions in the opinion with which I am not in full accord, but they are not necessary to the conclusions reached. For instance, I do not agree with all that is said in what is designated in the opinion as the third method of approach to the question whether the schedule of fares authorized by the commission is confiscatory within the meaning of the State and Federal Constitutions, or unlawful and unreasonable within the meaning of the statute creating the commission.

———

PARKE, J., filed a dissenting opinion as follows:

While agreeing with the conclusions of the court that the commission's method of determining the depreciation reserve was improper and that its order abolishing the second fare to Halethorpe was not unlawful, the writer believes the limita-

tion of the rate of return to 6.26 per centum was unlawful, and that the conclusions reached by the trial judge were substantially correct.

As was declared in *The Railroad Commission Cases,* 116 U. S. 307, at page 331, "This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law." If a public utility is deprived by a rate regulation of the right to receive a fair return upon the fair value of its property used in the public service, its property is confiscated, and the regulation is void, whether enacted by a legislative assembly or imposed by a commission pursuant to delegated authority. The determination of the constitutionality of a rate "depends upon the valuation of the property, the income to be derived from the proposed rate, and the proportion between the two—pure matters of fact," as was said by Mr. Justice Holmes in *Prentis v. Atlantic Coast Line,* 211 U. S. 210, 228. To adjudicate the value of the property of a public utility or to determine its earning capacity, or the resultant return upon this value of a proposed rate, is essentially the exercise of a judicial function; and, for that reason, the statute provides for a review by the court in order that the owners of a utility be not deprived of their property without due process of law. *Chicago, Mil. & St. P. Rwy. Co. v. Minnesota,* 134 U. S. 418, 457; *Reagan v. Farmers Loan & Trust Co.,* 154 U. S. 362; *Ohio Valley Co. v. Ben Avon Borough,* 253 U. S. 287. And this constitutional right to a judicial hearing in rate-making cases embraces not merely questions of law but also questions of fact, which are generally controlling. *Supra.*

So, the statute provides for a judicial inquiry by an action at law "to vacate and set aside any such order on the ground

that the rate or rates, tolls, charges, schedules, joint rate or rates, fixed in such order is *unlawful,* or that any such regulation, practice, act or service fixed in such order is *unreasonable."* Code, art. 23, sec. 404. The mere provision for judicial review is sufficient to demonstrate that the findings of fact by the commission are not made conclusive; and the statute deals with the point and makes the "determination, requirement, direction or order of the commission complained of" only *prima facie* correct, by providing that "the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful, as the case may be." Code, art. 23, sec. 408; *Pub. Serv. Commn. v. Byron,* 153 Md. 464, 470, 471, 479, *et seq.*

These provisions of the statute impose upon the court the duty of weighing and adjudging the facts upon which the unlawfulness or unreasonableness of the commission's findings in the instant case depends, and therefore the court cannot accept as final any determination of fact involved in the present controversy, but only give it the *prima facie* presumption of correctness; so, where the court thus finds from the facts that the action of the commission was either unlawful or unreasonable, it is not only the province but the plain and imperative duty of the court so to decide.

It is held by the commission that the subsisting street railway service is a method of transportation whose maintenance is necessary in the public interest, carrying more passengers during the hours of peak load than ever before in its long history. The present system is, therefore, far from being moribund. So, whatever the risks of its urban business, none is greater than its operation under less than a fair rate of return and the uncertainty that this ruinous situation will be surely, timely, and adequately relieved. A failure to grant such relief invites disaster; and stinted re-

lief often simply delays a crisis which, when it arrives, will prove immediately disastrous to the owners of the utility and, in the end, to the interests of the public. The position of the utility is made graver, and the public will not ultimately be benefited, by the ruling in the pending case, since, in the opinion of the writer of this dissent, the weight of the evidence clearly and satisfactorily establishes that the Commission's limitation of the fair rate of return to 6.26 per centum of the value of its property is confiscatory, and so unlawful. *Bluefield Co. v. Pub. Serv. Commn.,* 262 U. S. 679, 694-695.

Where the service rendered by the public utility is necessary, the owners of the utility are entitled to a return which will cover the expenses of operation and a fair return upon the property used. The right to compensation is fundamental. Since the property used represents capital invested, and since the continued existence of the utility depends upon the ability both to sustain its credit and to procure its capital requirements from time to time, a fair return on the property used means such a return as will induce capital to supply these financial demands. Capital is the most fluid and independent of commodities, and none is more subject to the law of competition; and the rate at which money is borrowed is the best index of the financial position and condition of the borrower. Under existing circumstances, the utility cannot find a market for preferred or common stock in order to obtain money for capital expenditures, and it has been compelled to procure funds through the issue of bonds and short-term notes. In the opinion of the court is found a table showing the cost to the utility of slightly over $18,000,000 of money, borrowed from July 1st, 1920, to March 1st, 1927, on bonds and securities. The average cost was 7.23 per centum. The lowest cost was 6.6 per centum for money borrowed in 1922 on bonds. The last loan was on March 1st, 1927, when $2,000,000 of three years 6 per centum gold notes were issued at a cost to the utility of 7.32 per centum. Without a sufficient supply of capital there can be no efficient nor economical administration of a municipal street railway system; and the onerous cost of these borrowings reflects the extent to which

the credit of the utility has been impaired by insufficiency of the revenues of the company and the uncertainty of its being allowed an increased rate of return on the value of the property which it employs for the public convenience. It would seem inevitable that a fair return on the property should be more than the cost of money obtained through the sale of bonds and other securities. *McCardle v. Indianapolis Water Co.*, 272 U. S. 400, 419, 420. The clear and convincing testimony in this case is that a basic rate of 6.26 per centum is not a fair return upon the property used, nor sufficient to enable the utility to maintain its credit or to secure its necessary capital at a reasonable cost. This evidence cannot be denied its legal effect by comparing the fares and rates of return allowed to street railway utilities of other municipalities of similar size, where the local conditions and hazards are different and a park tax equivalent to one-half a cent for every fare is not added. Such evidence is entitled to some weight in considering the lawfulness of the rate of return in question, but it is obvious that its value is slight when so much depends upon the circumstances of every case and the nature and method of determining the rate base upon which the return is allowed.

It follows that this testimony cannot prevail over the clear and satisfactory evidence on the part of the utility that a rate of return of 6.26 per centum is not compensatory, and that the case should have been remanded to the commission to ascertain a rate which would not be confiscatory. *Public Serv. Commn. v. North. Cent. Rwy. Co.*, 122 Md. 355, 389, 390.

---

Bond, C. J., filed a dissenting opinion as follows:

I concur in what Judge Parke has written, but would add these remarks in elaboration of some portions of it. It seems to me that, so long as the present equipment and service of the utility are necessary to the public, it is a mistake to say that the ordinarily fair return on that property may be pared

down at all merely because there were formerly more riders for it, more profitably distributed. The fair return on a utility property, for the service rendered with it, is to be calculated on present conditions only. The Supreme Court of the United States has said that the problem of a fair return is a problem of day by day, month by month, and year by year, as service continues. *Denver v. Denver Water Co.*, 246 U. S. 178; *Detroit United Ry. Co. v. Detroit*, 248 U. S. 429. I take it that if a new owner—a purchaser at a sale, for instance—should offer to meet the existing need with the same or similar equipment, he could not be denied the ordinary fair return on property of such value merely because conditions were better at some previous time. Another and different situation would be presented if it could be found as a fact that this sort of service cannot get the fair return because the service would not be worth so much to users; but I do not see the foundation for that finding in this case. The evidence given on the point goes only so far as to predict that a fare of ten cents would keep away two per cent. of the present users. And, beyond that testimony, if the full fair return requires a fare of so much, ten cents, comparison of that amount with prices generally paid for other services, bus fares, for instance, or fares of steam or interurban electric railways for similar mileage, or prices paid for cheap commodities and entertainments, seems to me to render it impossible to say that it is more than street railway transportation for an average of some miles is worth to riders.

Judge Parke authorizes me to add that these views are in accordance with his own.